**Bruce H. Cahn**, OSB No. 935450
cahnb@lanepowell.com
**Mohammed N. Workicho**, OSB No. 186140
workichom@lanepowell.com
**LANE POWELL** PC
601 SW Second Avenue, Suite 2100
Portland, Oregon 97204-3158
Telephone: 503.778.2100
Facsimile: 503.778.2200

Attorneys for Defendant

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **ATLAS GREENWAY, LLC.**, an Oregon limited liability company, | Case No. |
| Plaintiff, | DEFENDANT PHARMACA INTEGRATIVE PHARMACY, INC.'S NOTICE OF REMOVAL |
| v. | |
| **PHARMACA INTEGRATIVE PHARMACY, INC.**, a foreign corporation, | PURSUANT TO 28 U.S.C. §§ 1332, 1441, and 1446 |
| Defendant. | |

TO:    United States District Court for the District of Oregon, Portland Division; Clerk of the Washington County Circuit Court; and Abraham J. Barnett and Christene D. Cencer, attorneys for plaintiff

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. §§ 1332(a), 1441, and 1446, defendant Pharmaca Integrative Pharmacy, Inc. ("Pharmaca"), removes to this Court the state court action described below. Removal of this action is proper based on the following facts:

PAGE 1 -    NOTICE OF REMOVAL

1.      On or about February 28, 2020, plaintiff Atlas Greenway, LLC ("Atlas") filed a Complaint against Pharmaca in Washington County Circuit Court, captioned *Atlas Greenway, LLC, an Oregon limited liability company v. Pharmaca Integrative Pharmacy, Inc., a foreign corporation*, Case No 20CV09996 (the "State Court Action").

2.      Pharmaca received a copy of the Complaint and summons by personal service through its registered agent, CT Corporation System, on March 6, 2020.  Therefore, this Notice of Removal is timely because it is filed "within thirty days after receipt by the defendant * * * of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based * * *."  28 U.S.C. § 1446(b).

3.      The Complaint is a civil action.  Plaintiff asserts a single claim for breach of contract and seeks relief in excess of the amount in controversy requirements of 28 U.S.C. § 1332(a), as described below.

4.      Pharmaca has not pleaded, answered, or otherwise appeared in the State Court Action.  Pharmaca reserves all defenses.

5.      Pursuant to 28 U.S.C. § 1446(a), copies of "all process, pleadings, and orders served upon" Pharmaca are attached as Exhibit 1.

## DIVERSITY JURISDICTION

6.      Diversity jurisdiction under 28 U.S.C. § 1332 exists because this action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.      Citizenship of Parties.  The plaintiff and the defendant are of completely diverse citizenships.

        a.      Plaintiff Atlas is an Oregon limited liability company.  (Compl. ¶ 1.)  For purposes of diversity jurisdiction, an LLC is a citizen of every state where each of its members are citizens.  *See Johnson v. Columbia Props. Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006).  On

PAGE 2 -     NOTICE OF REMOVAL

information and belief, all of Atlas' members are citizens of Oregon. Atlas is thus a citizen of the state of Oregon. *Id.*

b.    Pharmaca is the only defendant in this action. At all relevant times, Pharmaca was and is a Delaware corporation. (Compl. ¶ 1.) Pharmaca's principal place of business is located in Boulder, Colorado. Pharmaca is thus a citizen of the state of Delaware and the state of Colorado. 28 U.S.C. § 1332(c)(1).

8.    Amount in Controversy. The amount in controversy in the State Court Action exceeds $75,000, exclusive of interest and costs, as more than that amount is alleged in the Complaint. 28 U.S.C. § 1446(c)(2). Plaintiff seeks $472,787.22 in monetary damages. (Compl. ¶¶ 17-18.)

## PROCEDURAL REQUIREMENTS

1.    Venue. This Court is in the judicial district and division embracing the place where the state court case was brought and is pending (Washington County). Thus, this Court is the proper district and division to which this case should be removed. *See* 28 U.S.C. §§ 1441(a), 1446(a).

2.    Removal is Proper and Timely. Pharmaca received the Summons and Complaint in this matter on or after March 6, 2020. Thus, this Notice of Removal is filed within 30 days after Pharmaca's receipt of the initial pleading alleging a basis for removal as required by 28 U.S.C. § 1446(b)(1). It is also less than one year after the commencement of the action, as required by 28 U.S.C. § 1446(c)(1). This Court has original jurisdiction over this case under 28 U.S.C. § 1332(a). Thus, removal is proper under 28 U.S.C. § 1441(a).

3.    Consent of Served Defendants. There are no other defendants.

4.    Pleadings and Process. Attached as **Exhibit 1** is a copy of all process and pleadings received by Pharmaca in the State Court Action. *See* 28 U.S.C. § 1446(a).

5.    Notice. A copy of Defendant's Notice to Clerk of Court and Adverse Party of Filing of Removal to Federal Court will be timely filed with the clerk of the state court in which

PAGE 3 -    NOTICE OF REMOVAL

the action is pending and served on plaintiff pursuant to 28 U.S.C. § 1446(d) (attached hereto as **Exhibit 2,** excluding exhibits).

6.      <u>Signature</u>.  This Notice of Removal is signed pursuant to Fed. R. Civ. P. 11.  *See* 28 U.S.C. § 1446(a).

7.      Based upon the foregoing, this Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332, and the claims may be removed to this Court under 28 U.S.C. §§ 1441 and 1446.

8.      In the event that plaintiff seeks to remand this case, or the Court considers remand *sua sponte*, Pharmaca respectfully requests the opportunity to submit such additional argument or evidence in support of removal as may be necessary.

9.      Pharmaca has good and sufficient defenses to this action and does not waive any defenses, jurisdictional or otherwise, by the filing of this Notice.

WHEREFORE, Pharmaca removes this action from the Circuit Court for the State of Oregon, for the County of Washington, to the United States District Court for the District of Oregon, Portland Division.

DATED:  March 31, 2020

LANE POWELL PC


By   s/ Bruce H. Cahn
     Bruce H. Cahn, OSB No. 935450
     Mohammed N. Workicho, OSB No. 186140
     Telephone: 503.778.2100
     Facsimile: 503.778.2200
     Attorneys for Defendant


PAGE 4 -    NOTICE OF REMOVAL

2/28/2020 4:40 PM
20CV09996

1

2

3

4          IN THE CIRCUIT COURT OF THE STATE OF OREGON

5              FOR THE COUNTY OF WASHINGTON

6
| ATLAS GREENWAY, LLC, an Oregon | Case No. _____ |
7      limited liability company,

| | **COMPLAINT (Breach of Contract)** |
8              Plaintiff,

9          v. | Claim Not Subject to Mandatory Arbitration |

10     PHARMACA INTEGRATIVE
        PHARMACY, INC., a foreign corporation, | Claim for $472,787.22 |
11

12              Defendant. | FEE AUTHORITY: Fee Authority: ORS 21.160(1)(c) |

13          Plaintiff alleges as follows:

14                                    1.

15
16          At all times material herein, Plaintiff was and is an Oregon limited liability

17     company duly organized and existing under the laws of the state of Oregon.  At all

       times material herein, Defendant was and is a Delaware corporation.

18
                                        2.
19
20          Plaintiff is the landlord, and Defendant is the tenant, under a commercial lease

21     dated May 5, 2014, between Plaintiff and Defendant (the "Lease").  A true and correct

22     copy of the Lease is attached hereto as Exhibit A and incorporated herein by

       reference. The intended expiration date for the Lease was October 31, 2024.
23
                                        3.
24
25          Pursuant to the Lease, Defendant rented premises located at 12180 Scholls

26     Ferry Road, Tigard, Washington County, Oregon 97223 (the "Premises").

                                        4.
27
28          The Lease is a valid and enforceable contract.

PAGE 1 – COMPLAINT

The Barnett Firm, LLC
11501 SW Pacific Hwy.
Suite 201; Portland, OR 97223
(503) 688-5106 (503) 716-4633 fax

Exhibit 1 - Page 1

5.

1
2   Plaintiff has performed all conditions precedent in the Lease.

6.

3
4   At some time prior to May 2018, Pharmaca changed the nature of the store by
5   closing the pharmacy, in violation of Section 6.1 of the Lease.

7.

6
7   On or about May 23, 2018, Plaintiff became aware that Defendant had placed
8   "Store Closing Clearance" signs in its windows at the Premises, in violation of Article
9   VI of the Lease.

8.

10
11  On or about May 23, 2018, Plaintiff became aware that Defendant was not
12  keeping its store shelves fully stocked, in violation of Section 6.1 of the Lease.

9.

13
14  By letter dated May 24, 2018, Plaintiff gave notice to Defendant of Defendant's
15  default of the Lease (the "Notice of Default").  A true and correct copy of the Notice of
16  Default is attached hereto as Exhibit B and incorporated herein by reference.

10.

17
18  On or about May 31, 2018, Defendant advised Plaintiff that Defendant had
19  removed the "Store Closing Clearance" signs in its windows at the Premises.  Plaintiff
20  never advised Defendant that it had fully restocked its shelves.

11.

21
22  By letter dated June 19, 2018, Plaintiff advised Defendant that as Defendant
23  had not cured all of the defaults identified in Plaintiff's May 24, 2018 letter, Plaintiff was
24  terminating the Defendant's right to possession pursuant to Lease Section 17.2.2.
25  Plaintiff changed the locks on the Premises and begun efforts to relet the premises.
26  Plaintiff asked that Pharmaca continue to pay monthly minimum rent pursuant to the
27  terms of the Lease.
28  ///

PAGE 2 – COMPLAINT

The Barnett Firm, LLC
11501 SW Pacific Hwy.
Suite 201; Portland, OR 97223
(503) 688-5106 (503) 716-4633 fax

Exhibit 1 - Page 2

12.

On or about July 3, 2018, Plaintiff told Defendant that Defendant could enter the Premises to retrieve its personal property. Defendant removed only a small portion of its personal property, leaving the remainder for Plaintiff to dispose of. On or about September 24, 2018, Defendant confirmed with Plaintiff that Plaintiff had abandoned the remaining personal property.

13.

Defendant has not paid rent on the Premises since August 2018, in violation of Section 17.1.1 of the Lease. Defendant has not paid Common Area Maintenance ("CAM") charges or the interest accruing on the unpaid rent, as required by Section 17.2.3 of the Lease, since August 2018. The lease provides for recovery of attorney fees in Section 17.2.3.

14.

Defendant has failed to perform as required in the Lease in the following particulars:

a.    Violating Section 6.1 by changing the character of the business;

b.    Violating Article VII by putting up the "Store Closing Sale" signs;

c.    Violating Section 6.1 by not keeping its shelves fully stocked;

d.    Violating Section 17.1.1 by failing to pay rent;

e.    Violating Section 3.4.1 by failing to pay CAM charges; and

f.    Violating Section 17.2.3 by failing to pay interest charges.

15.

Starting at the time the Lease was terminated, Plaintiff used commercially reasonable efforts to relet the Premises. Plaintiff was able to relet the Premises and the new tenant began to pay rent on or about February 9, 2020 at a rate $1,500.00/month more than Plaintiff would have been receiving from Defendant had Defendant not defaulted on the Lease. Plaintiff incurred new tenant improvement costs, leasing commission fees, and legal fees in order to enter into a new lease for

PAGE 3 – COMPLAINT

Exhibit 1 - Page 3

1   the Premises ("New Lease").   Plaintiff also spent $1,620.00 to remove Defendant's
2   signs from the Premises.

3                                            16.

4        Pursuant to the Lease, Plaintiff is entitled to damages in connection with
5   Defendant's default and the required reletting of the Premises, including but not limited
6   to:

7   • Lost rent.
8   • Legal expenses and related costs incurred by Plaintiff following Defendant's
9     default.
10  • Costs incurred by Plaintiff in restoring the Premises to good order and
11    condition, and in remodeling, renovating, and otherwise preparing the Premises
12    for reletting.
13  • All costs of reletting, including brokerage commissions.
14  • Interest on all such expenditures at the rate and in the manner allowed by
15    Section §17.2.3 of the Lease.

16                                            17.

17       Defendant's failure to perform under the Lease has directly damaged Plaintiff.
18  As of February 28, 2020, Defendant is liable to Plaintiff for $472,787.22 in damages for
19  defaulting on the Lease, together with interest thereon as allowed in Section 17.2.3 of
20  the Lease, as follows:

21  a. The remaining rent owed under the Lease: $911,250.00 less a credit in the
22     amount for rent to be received under the New Lease through the expected
23     termination date of the Lease in the amount of $786,399.18;
24  b. New tenant improvement costs, leasing commissions, and legal fees in order to
25     enter into the New Lease: $161,445.69;
26  c. Unpaid CAM charges between July 3, 2018 and February 8, 2020: $62,526.71;
27  d. Unamortized tenant improvement allowance from Defendant: $122,344.00; and
28  e. Removal of Defendant's signage: $1,620.00.

PAGE 4 – COMPLAINT

Exhibit 1 - Page 4

18.

Plaintiff has incurred attorney fees and costs in connection with the Lease termination and reletting of the Premises. Defendant is entitled to recover its reasonable attorney fees and costs incurred herein.

THEREFORE, Plaintiff prays for damages as follows:

(A) For a judgment in favor of Plaintiff and against Defendant;

(B) For damages against Defendant in an amount of $472,787.22, plus interest as allowed in Lease §17.2.3;

(C) For Plaintiff's attorney fees, costs, and disbursements herein; and

(D) For such other relief as the Court deems just and proper.

DATED this ___ day of February 2020.

THE BARNETT FIRM, LLC


ABRAHAM J. BARNETT, OSB #082545
CHRISTENE D. CENCER, OSB #163589
11501 SW Pacific Hwy., Suite 201
Portland, OR 97223
(503) 688-5106
(503) 716-4633 fax
ajbarnett@hg-wt.com
    Of Attorneys for Plaintiff

TRIAL ATTORNEY:
    Abraham J. Barnett, OSB #082545

PAGE 5 – COMPLAINT

Exhibit 1 - Page 5

*ORIGINAL*

LEASE AGREEMENT

Washington County, Oregon


by and between


Atlas Greenway LLC

"Landlord"


and


Pharmaca Integrative Pharmacy, Inc.

"Tenant"


_May 5th_, 2014


{00214507:7}

EXHIBIT ___A___

PAGE __1__ OF __52__

Exhibit 1 - Page 6

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS AND FUNDAMENTAL PROVISIONS ................................................. 1
    1.1    Basic Lease Provisions ........................................................................... 1
    1.2    Definitions .............................................................................................. 2
    1.3    Significance of Basic Lease Provisions and Definitions ....................... 4

ARTICLE II DEMISED PREMISES AND TERM ................................................................. 4
    2.1    Demise of Premises ............................................................................... 4
    2.2    Condition of Premises ........................................................................... 4
    2.3    Reserved Use by Landlord ..................................................................... 5
    2.4    Quiet Enjoyment .................................................................................... 5
    2.5    Intentionally Omitted ............................................................................ 5
    2.6    Term ....................................................................................................... 5
    2.7    Options to Extend .................................................................................. 5
    2.8    Right of First Offer ................................................................................ 5

ARTICLE III RENT AND OTHER CHARGES ..................................................................... 6
    3.1    Place of Payment ................................................................................... 6
    3.2    Minimum Rent ....................................................................................... 6
    3.3    Percentage Rent ..................................................................................... 6
    3.4    Operating Charges ................................................................................. 7
    3.5    Real Estate Taxes .................................................................................. 9
    3.6    Marketing ............................................................................................ 10

ARTICLE IV INTENTIONALLY OMITTED ...................................................................... 10

ARTICLE V UTILITIES ................................................................................................. 10

ARTICLE VI USE OF PREMISES ................................................................................... 10
    6.1    Tenant's Use ........................................................................................ 10
    6.2    Trade Name .......................................................................................... 11
    6.3    Legal Operation of Premises ............................................................... 12
    6.4    Operating Rules and Regulations ........................................................ 12
    6.5    Exclusive Use ...................................................................................... 12

ARTICLE VII SIGNS AND DISPLAYS ............................................................................ 12

ARTICLE VIII ALTERATIONS TO PREMISES .................................................................. 13
    8.1    Alterations to Premises ........................................................................ 13
    8.2    Compliance with Laws ........................................................................ 13
    8.3    Plans .................................................................................................... 13
    8.4    Mandatory Refurbishing ...................................................................... 14

ARTICLE IX CONSTRUCTION LIENS ............................................................................ 14

ARTICLE X REPAIRS AND MAINTENANCE .................................................................... 14
    10.1   Landlord Maintenance and Repairs .................................................... 14
    10.2   Tenant Maintenance and Repairs ........................................................ 15
    10.3   Noxious Odors ..................................................................................... 15

ARTICLE XI COMMON AREAS .................................................................................... 15
    11.1   Control of Common Areas ................................................................... 15
    11.2   Alterations in the Common Areas ....................................................... 15
    11.3   Non-Interference .................................................................................. 16

ARTICLE XII INSURANCE ............................................................................................ 16
    12.1   Insurance .............................................................................................. 16
    12.2   Increase in Insurance Premiums .......................................................... 16

{00214507;7}

EXHIBIT __A__

PAGE __2__ OF __52__

Exhibit 1 - Page 7

2/28/2020 4:40 PM
20CV09996

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF WASHINGTON

| ATLAS GREENWAY, LLC, an Oregon limited liability company, | Case No. _____ |
|---|---|
| Plaintiff, | **COMPLAINT (Breach of Contract)** |
| v. | Claim Not Subject to Mandatory Arbitration |
| PHARMACA INTEGRATIVE PHARMACY, INC., a foreign corporation, | Claim for $472,787.22 |
| Defendant. | FEE AUTHORITY: Fee Authority: ORS 21.160(1)(c) |

Plaintiff alleges as follows:

1.

At all times material herein, Plaintiff was and is an Oregon limited liability company duly organized and existing under the laws of the state of Oregon. At all times material herein, Defendant was and is a Delaware corporation.

2.

Plaintiff is the landlord, and Defendant is the tenant, under a commercial lease dated May 5, 2014, between Plaintiff and Defendant (the "Lease"). A true and correct copy of the Lease is attached hereto as Exhibit A and incorporated herein by reference. The intended expiration date for the Lease was October 31, 2024.

3.

Pursuant to the Lease, Defendant rented premises located at 12180 Scholls Ferry Road, Tigard, Washington County, Oregon 97223 (the "Premises").

4.

The Lease is a valid and enforceable contract.

PAGE 1 – COMPLAINT

The Bernett Firm, LLC
11501 SW Pacific Hwy.
Suite 201; Portland, OR 97223
(503) 688-5106 (503) 716-4633 fax

Exhibit 1 - Page 8

5.

Plaintiff has performed all conditions precedent in the Lease.

6.

At some time prior to May 2018, Pharmaca changed the nature of the store by closing the pharmacy, in violation of Section 6.1 of the Lease.

7.

On or about May 23, 2018, Plaintiff became aware that Defendant had placed "Store Closing Clearance" signs in its windows at the Premises, in violation of Article VI of the Lease.

8.

On or about May 23, 2018, Plaintiff became aware that Defendant was not keeping its store shelves fully stocked, in violation of Section 6.1 of the Lease.

9.

By letter dated May 24, 2018, Plaintiff gave notice to Defendant of Defendant's default of the Lease (the "Notice of Default").  A true and correct copy of the Notice of Default is attached hereto as Exhibit B and incorporated herein by reference.

10.

On or about May 31, 2018, Defendant advised Plaintiff that Defendant had removed the "Store Closing Clearance" signs in its windows at the Premises.  Plaintiff never advised Defendant that it had fully restocked its shelves.

11.

By letter dated June 19, 2018, Plaintiff advised Defendant that as Defendant had not cured all of the defaults identified in Plaintiff's May 24, 2018 letter, Plaintiff was terminating the Defendant's right to possession pursuant to Lease Section 17.2.2. Plaintiff changed the locks on the Premises and begun efforts to relet the premises. Plaintiff asked that Pharmaca continue to pay monthly minimum rent pursuant to the terms of the Lease.

///

PAGE 2 – COMPLAINT

12.

On or about July 3, 2018, Plaintiff told Defendant that Defendant could enter the Premises to retrieve its personal property. Defendant removed only a small portion of its personal property, leaving the remainder for Plaintiff to dispose of. On or about September 24, 2018, Defendant confirmed with Plaintiff that Plaintiff had abandoned the remaining personal property.

13.

Defendant has not paid rent on the Premises since August 2018, in violation of Section 17.1.1 of the Lease. Defendant has not paid Common Area Maintenance ("CAM") charges or the interest accruing on the unpaid rent, as required by Section 17.2.3 of the Lease, since August 2018. The lease provides for recovery of attorney fees in Section 17.2.3.

14.

Defendant has failed to perform as required in the Lease in the following particulars:

    a.    Violating Section 6.1 by changing the character of the business;

    b.    Violating Article VII by putting up the "Store Closing Sale" signs;

    c.    Violating Section 6.1 by not keeping its shelves fully stocked;

    d.    Violating Section 17.1.1 by failing to pay rent;

    e.    Violating Section 3.4.1 by failing to pay CAM charges; and

    f.    Violating Section 17.2.3 by failing to pay interest charges.

15.

Starting at the time the Lease was terminated, Plaintiff used commercially reasonable efforts to relet the Premises. Plaintiff was able to relet the Premises and the new tenant began to pay rent on or about February 9, 2020 at a rate $1,500.00/month more than Plaintiff would have been receiving from Defendant had Defendant not defaulted on the Lease. Plaintiff incurred new tenant improvement costs, leasing commission fees, and legal fees in order to enter into a new lease for

PAGE 3 – COMPLAINT

The Barnett Firm, LLC
11501 SW Pacific Hwy.
Suite 201; Portland, OR 97223
(503) 680-5106 (503) 716-4633 fax

Exhibit 1 - Page 10

1    the Premises ("New Lease").   Plaintiff also spent $1,620.00 to remove Defendant's
2    signs from the Premises.

3                                         16.

4         Pursuant to the Lease, Plaintiff is entitled to damages in connection with
5    Defendant's default and the required reletting of the Premises, including but not limited
6    to:

7    • Lost rent.
8    • Legal expenses and related costs incurred by Plaintiff following Defendant's
9        default.
10   • Costs incurred by Plaintiff in restoring the Premises to good order and
11       condition, and in remodeling, renovating, and otherwise preparing the Premises
12       for reletting.
13   • All costs of reletting, including brokerage commissions.
14   • Interest on all such expenditures at the rate and in the manner allowed by
15       Section §17.2.3 of the Lease.

16                                        17.

17        Defendant's failure to perform under the Lease has directly damaged Plaintiff.
18   As of February 28, 2020, Defendant is liable to Plaintiff for $472,787.22 in damages for
19   defaulting on the Lease, together with interest thereon as allowed in Section 17.2.3 of
20   the Lease, as follows:

21   a.  The remaining rent owed under the Lease: $911,250.00 less a credit in the
22       amount for rent to be received under the New Lease through the expected
23       termination date of the Lease in the amount of $786,399.18;
24   b.  New tenant improvement costs, leasing commissions, and legal fees in order to
25       enter into the New Lease: $161,445.69;
26   c.  Unpaid CAM charges between July 3, 2018 and February 8, 2020: $62,526.71;
27   d.  Unamortized tenant improvement allowance from Defendant: $122,344.00; and
28   e.  Removal of Defendant's signage: $1,620.00.

PAGE 4 – COMPLAINT

Exhibit 1 - Page 11

18.

Plaintiff has incurred attorney fees and costs in connection with the Lease termination and reletting of the Premises. Defendant is entitled to recover its reasonable attorney fees and costs incurred herein.

THEREFORE, Plaintiff prays for damages as follows:

(A) For a judgment in favor of Plaintiff and against Defendant;

(B) For damages against Defendant in an amount of $472,787.22, plus interest as allowed in Lease §17.2.3;

(C) For Plaintiff's attorney fees, costs, and disbursements herein; and

(D) For such other relief as the Court deems just and proper.

DATED this ___ day of February 2020.

THE BARNETT FIRM, LLC

ABRAHAM J. BARNETT, OSB #082545
CHRISTENE D. CENCER, OSB #163589
11501 SW Pacific Hwy., Suite 201
Portland, OR 97223
(503) 688-5106
(503) 716-4633 fax
ajbarnett@hg-wt.com
    *Of Attorneys for Plaintiff*

**TRIAL ATTORNEY:**
    **Abraham J. Barnett, OSB #082545**

PAGE 5 – COMPLAINT

*ORIGINAL*

LEASE AGREEMENT

Washington County, Oregon

by and between

Atlas Greenway LLC

"Landlord"

and

Pharmaca Integrative Pharmacy, Inc.

"Tenant"

May 5ᵗʰ, 2014

{00214507;7}

EXHIBIT  A
PAGE  1  OF  52

Exhibit 1 - Page 13

**TABLE OF CONTENTS**

ARTICLE I DEFINITIONS AND FUNDAMENTAL PROVISIONS ............................................................1
    1.1    Basic Lease Provisions..................................................................................................1
    1.2    Definitions.....................................................................................................................2
    1.3    Significance of Basic Lease Provisions and Definitions ...............................................4

ARTICLE II DEMISED PREMISES AND TERM .........................................................................................4
    2.1    Demise of Premises.......................................................................................................4
    2.2    Condition of Premises...................................................................................................4
    2.3    Reserved Use by Landlord ............................................................................................5
    2.4    Quiet Enjoyment ...........................................................................................................5
    2.5    Intentionally Omitted ...................................................................................................5
    2.6    Term..............................................................................................................................5
    2.7    Options to Extend.........................................................................................................5
    2.8    Right of First Offer.......................................................................................................5

ARTICLE III RENT AND OTHER CHARGES .............................................................................................6
    3.1    Place of Payment ..........................................................................................................6
    3.2    Minimum Rent ..............................................................................................................6
    3.3    Percentage Rent............................................................................................................6
    3.4    Operating Charges........................................................................................................7
    3.5    Real Estate Taxes .........................................................................................................9
    3.6    Marketing...................................................................................................................10

ARTICLE IV INTENTIONALLY OMITTED .............................................................................................10

ARTICLE V UTILITIES................................................................................................................................10

ARTICLE VI USE OF PREMISES................................................................................................................10
    6.1    Tenant's Use ...............................................................................................................10
    6.2    Trade Name.................................................................................................................11
    6.3    Legal Operation of Premises ......................................................................................12
    6.4    Operating Rules and Regulations ...............................................................................12
    6.5    Exclusive Use..............................................................................................................12

ARTICLE VII SIGNS AND DISPLAYS .......................................................................................................12

ARTICLE VIII ALTERATIONS TO PREMISES ........................................................................................13
    8.1    Alterations to Premises...............................................................................................13
    8.2    Compliance with Laws ...............................................................................................13
    8.3    Plans ...........................................................................................................................13
    8.4    Mandatory Refurbishing.............................................................................................14

ARTICLE IX CONSTRUCTION LIENS ......................................................................................................14

ARTICLE X REPAIRS AND MAINTENANCE ..........................................................................................14
    10.1    Landlord Maintenance and Repairs............................................................................14
    10.2    Tenant Maintenance and Repairs ...............................................................................15
    10.3    Noxious Odors ............................................................................................................15

ARTICLE XI COMMON AREAS .................................................................................................................15
    11.1    Control of Common Areas ..........................................................................................15
    11.2    Alterations in the Common Areas ...............................................................................15
    11.3    Non-Interference .........................................................................................................16

ARTICLE XII INSURANCE ..........................................................................................................................16
    12.1    Insurance ....................................................................................................................16
    12.2    Increase in Insurance Premiums .................................................................................16

{00214507;7}

EXHIBIT ___A___

PAGE _2_ OF _52_

Exhibit 1 - Page 14

12.3    Waiver of Subrogation ................................................................ 17
12.4    Mutual Releases ........................................................................ 17

ARTICLE XIII HAZARDOUS MATERIALS .......................................................... 17

ARTICLE XIV SUBORDINATION AND ATTORNMENT .................................... 18
14.1    Subordination ............................................................................ 18
14.2    Succession to Landlord's Interest; Attornment ....................... 18
14.3    Estoppel Certificate ................................................................. 18

ARTICLE XV TRANSFERS, ASSIGNMENT AND SUBLETTING ..................... 18
15.1    Covenant Not to Assign or Sublet Without Consent .............. 18
15.2    Conditions for Landlord's Consent ......................................... 19
15.3    Assignment in Violation of Article .......................................... 19
15.4    No Claim for Damages ............................................................. 19

ARTICLE XVI DAMAGE TO PREMISES; EMINENT DOMAIN; INDEMNITY ........... 20
16.1    Damage ...................................................................................... 20
16.2    Eminent Domain ........................................................................ 20
16.3    Tenant Indemnity ...................................................................... 21

ARTICLE XVII DEFAULT AND REMEDIES .................................................... 21
17.1    Default of Tenant ...................................................................... 21
17.2    Remedies of Landlord .............................................................. 21
17.3    Intentionally Omitted ............................................................... 22
17.4    Late Charges ............................................................................. 22
17.5    Remedies Cumulative ............................................................... 22

ARTICLE XVIII SURRENDER OF PREMISES ................................................. 22

ARTICLE XIX ACCESS TO PREMISES ............................................................ 23

ARTICLE XX MISCELLANEOUS ..................................................................... 23
20.1    Notices ....................................................................................... 23
20.2    Successors and Assigns ............................................................ 23
20.3    Representations and Entire Agreement ................................... 24
20.4    Time is of the Essence .............................................................. 24
20.5    Recording .................................................................................. 24
20.6    Relationship of Parties ............................................................. 24
20.7    Waiver ....................................................................................... 24
20.8    Litigation ................................................................................... 24
20.9    Force Majeure ........................................................................... 24
20.10   Governing Law .......................................................................... 24
20.11   Partial Invalidity ....................................................................... 24
20.12   Submission of Lease .................................................................. 24
20.13   Interpretation ............................................................................ 24
20.14   Brokerage Commissions .......................................................... 25
20.15   Limitation of Liability .............................................................. 25
20.16   Survival of Obligations ............................................................ 25
20.17   Headings, Captions and References ........................................ 25
20.18   Accord and Satisfaction ........................................................... 25
20.19   Performance of Tenant's Covenants ........................................ 25
20.20   Entire Agreement ...................................................................... 25
20.21   Landlord Subordination Agreement ......................................... 25

{00214507;7}

EXHIBIT ___A___

PAGE __3__ OF __52__

Exhibit 1 - Page 15

EXHIBITS

Exhibit "A" Site Plan

Exhibit "B" Intentionally Omitted

Exhibit "C-1" Landlord's Work

Exhibit "C-2" Tenant's Work

Exhibit "C-3" Construction Rules

Exhibit "D" Sign Criteria

Exhibit "E" Confirmation of Lease Term

Exhibit "F" Rules and Regulations

Exhibit "G" Landlord Subordination Agreement form

{00214507;7}

EXHIBIT A
PAGE 4 OF 52

Exhibit 1 - Page 16

ARTICLE I
DEFINITIONS AND FUNDAMENTAL PROVISIONS

1.1    Basic Lease Provisions

| | | |
|---|---|---|
| 1.1.1 | DATE | _May 5¹_, 2014 |
| 1.1.2 | LANDLORD | ATLAS GREENWAY LLC, an Oregon limited liability company |
| 1.1.3 | ADDRESS OF LANDLORD | Atlas Greenway LLC<br>333 NW 9th Avenue, Suite 1009<br>Portland, Oregon 97209 |
| 1.1.4 | ADDRESS FOR RENT PAYMENTS | Atlas Greenway LLC<br>c/o RTG Property Management<br>333 NW 9th Avenue, Suite 1010<br>Portland, OR 97209<br>Attention: Matthew Klutznick |
| 1.1.5 | TENANT | Pharmaca Integrative Pharmacy, Inc., a Delaware corporation |
| 1.1.6 | ADDRESS OF TENANT | Pharmaca Integrative Pharmacy, Inc.<br>4940 Pearl East Circle, Suite 301<br>Boulder, CO 80301 |
| 1.1.7 | TENANT'S TRADE NAME | "Pharmaca" or other trade name containing the word "Pharmaca" |
| 1.1.8 | PREMISES ADDRESS | 12180 Scholls Ferry Road<br>Tigard, OR 97223 |
| 1.1.9 | APPROXIMATE GROSS LEASABLE AREA OF RETAIL CENTER | 23,567 |
| | APPROXIMATE GROSS LEASABLE AREA OF PREMISES | 4,500 |
| 1.1.10 | ANTICIPATED DELIVERY DATE | July 15, 2014 |
| 1.1.11 | RENT COMMENCEMENT DATE | The earlier to occur of (i) ninety (90) days after the date that Landlord delivers possession of the Premises to Tenant with all Landlord's Work substantially completed (the "Delivery Date"), and (ii) the date Tenant opens for business in the Premises. |
| 1.1.12 | EXPIRATION DATE | The last day of the month that contains the ten (10) year anniversary of the Rent Commencement Date; provided that if the Rent Commencement Date is the first of a month, the Expiration Date shall be the last day of the month immediately preceding such anniversary. The expiration date of the Lease shall be confirmed in the Confirmation of the Lease Term in the form attached as Exhibit "E" to be executed by Landlord and Tenant promptly following |

{00214507;7}

1

EXHIBIT ___A___

PAGE _5_ OF _52_

Exhibit 1 - Page 17

Landlord's delivery of possession of the Premises to Tenant.

1.1.13    PERMITTED USE    Tenant shall use the Premises for the operation of a drugstore and pharmacy, and for no other purpose. The "operation of a drugstore and pharmacy" includes, but is not limited to, (i) providing full prescription services and the retail sale of prescription medicines, over-the-counter medications, nutritional and botanical dietary supplements, herbs, aromatherapy, holistic products, naturopathic or homeopathic medicines and supplements, body and bath products, natural health and beauty products, organic soft goods and other sundry items, greeting cards, gift wrap and any other product commonly sold at drug stores and/or pharmacies; and (ii) only to the extent not prohibited by any applicable laws and regulations, the ancillary sale of services directly related to the operation of a drugstore and pharmacy, including, but not limited to, makeover demonstrations, nutritional counseling, prevention and better health clinics and for health events such as "spa day," health and medical screenings and flu shots.

1.1.14    MINIMUM RENT

| Lease Year | Monthly Minimum Rent | Annual Minimum Rent | Rate Per Agreed Sq. Foot | Percentage Rent Breakpoint |
|---|---|---|---|---|
| Years 1-5 | $11,250 | $135,000 | $30.00 | $4,500,000 |
| Years 6-10 | $12,375 | $148,500 | $33.00 | $4,950,000 |
| *1st Extension* | | | | |
| Years 11-15 | $13,612.50 | $163,350 | 36.30 | $5,445,000 |
| *2nd Extension* | | | | |
| Years 15-20 | $14,973.75 | $179,685 | $39.93 | $5,989,500 |

1.1.15    PERCENTAGE RENT RATE    Three percent (3%) of Tenant's Gross Sales in any Lease Year in excess of the Percentage Rent Breakpoint (as defined in Section 1.1.14) for such Lease Year.

1.1.16    PREPAID RENT    Eleven Thousand Two Hundred Fifty and No/100 Dollars ($11,250.00)

1.1.17    SECURITY DEPOSIT    N/A

1.1.18    GUARANTOR    N/A

1.1.19    ADDRESS OF GUARANTOR    N/A

1.1.20    PROCURING BROKER    Commercial Realty Advisors NW for Landlord

HSM Pacific, Inc. for Tenant

1.2    Definitions

1.2.1    Common Area Retail Facilities  The parking areas, plazas, sidewalks, roofs, roadways, loading platforms, service arenas, landscaped areas, drainage facilities, water quality facilities, signs, curbing, refuse containers, stairways, rest rooms, and shelters, and any other facilities designated from time to time by Landlord as

{00214507;7}    2    EXHIBIT A

PAGE 6 OF 52

Exhibit 1 - Page 18

Common Area Retail Facilities or from time to time used by Landlord in the operation and management of the Retail Center or made available by Landlord for the non-exclusive use of the tenants in the Retail Center, their employees, agents, customers, licensees and invitees, including, without limitation, offsite facilities such as public sidewalks and landscaping in public areas adjoining the Retail Center.

      1.2.2    <u>GLA</u>  The Premises' GLA is the gross leasable area of the Premises as measured from the outside of exterior walls or the center of any common walls, as the case may be, without deduction for columns or other structural elements within the Premises. The Retail Center's GLA is equal to the aggregate amount of the gross leasable areas of all premises in the Retail Center as same may be modified, altered, expanded or reduced from time to time, excluding the GLA of any noncontiguous storage areas, mezzanines, basements or kiosks. Landlord may exclude from the Retail Center GLA any ground leased premises for which the tenant thereof is directly responsible for its own maintenance, repair, taxes, insurance and/or other services that would customarily be provided by Landlord and reimbursed by tenant as Operating Charges.

      1.2.3    <u>Hazardous Materials</u>  Any (a) oil, petroleum products, flammable substances, explosives, radioactive materials, hazardous wastes or substances, toxic wastes or substances or any other wastes, materials or pollutants which (i) pose a hazard to the Premises or to persons on or about the Premises, or (ii) cause the Premises to be in violation of any Hazardous Materials Laws; (b) asbestos in any form, urea formaldehyde foam insulation, transformers or other equipment which contain dielectric fluid containing levels or polychlorinated biphenyls, or radon gas; (c) chemical, material or substance defined as or included in the definition of "hazardous materials," "extremely hazardous waste," "restricted hazardous waste," or "toxic substances" or words of similar import under any applicable local, state or federal law or under the regulations adopted or publications promulgated pursuant thereto, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 USC § 9601, <u>et seq.</u>; the Federal Water Pollution Control Act, as amended, 33 USC § 1251, <u>et seq.</u>; ORS Chapter 465, Hazardous Materials I; ORS Chapter 466, Hazardous Waste and Hazardous Materials II; ORS Chapter 468, Pollution Control; and (d) other chemical, material or substance, exposure to which is prohibited, limited or regulated by any governmental authority or may or could pose a hazard to the health and safety of the occupants of the Premises or the owners and/or occupants of property adjacent to or surrounding the Premises, or any other person coming upon the Premises or adjacent property.

      1.2.4    <u>Hazardous Materials Claims</u>  Any and all enforcement, cleanup, removal, remedial or other governmental or regulatory actions, agreements or orders threatened, instituted or completed pursuant to any Hazardous Materials Laws, together with any and all claims made or threatened by any third party against Landlord, Tenant or the Premises relating to damage, contribution, cost recovery compensation, loss or injury resulting from the presence, release or discharge of any Hazardous Materials.

      1.2.5    <u>Hazardous Materials Laws</u>  Any federal, state or local laws, ordinances, regulations or policies relating to the environment, health and safety, and Hazardous Materials (including, without limitation, the use, handling, transportation, production, disposal, discharge or storage thereof) or to industrial hygiene or the environmental conditions on, under or about the Premises, including, without limitation, soil, groundwater and indoor and ambient air conditions.

      1.2.6    <u>Landlord Work</u>  The work to be performed by Landlord with respect to the Premises prior to Landlord's delivery of possession of the Premises to Tenant, which is more particularly described in the Work Requirements on the attached <u>Exhibit "C-1"</u>.

      1.2.7    <u>Lease Year</u>  The first Lease Year of the term hereof shall commence upon the Rent Commencement Date. If the Rent Commencement Date shall not fall upon the first day of a calendar month, then the first Lease Year shall be the period of time from the Rent Commencement Date to the end of the month in which the Rent Commencement Date shall occur plus the following twelve (12) calendar months. Each Lease Year thereafter shall be a successive period of twelve (12) calendar months.

      1.2.8    <u>Premises</u>  An approximately 4,500 gross square foot area located in the building (the "Building") denoted on the Site Plan as the building within which the Premises are located. A drawing of the approximate boundaries and location of the Premises is attached hereto as <u>Exhibit A-1</u>.

{00214507;7}

3

EXHIBIT <u>A</u>

PAGE <u>1</u> OF <u>52</u>

Exhibit 1 - Page 19

1.2.9    Rent  Minimum Rent, Percentage Rent, and "Additional Rent" (being the charges specifically set forth in Article III, and all other amounts and charges payable by Tenant under any provision of this Lease) and any rent or sales tax hereinafter levied by governmental authority on any Rent or Additional Rent whether payable by Landlord or Tenant or collectible by Landlord from Tenant.

1.2.10    Retail Center  The land and the buildings from time to time known as "Greenway Town Center," situated in Washington County, Oregon, as may be expanded, altered, modified or rearranged by Landlord from time to time.  The depiction of the Retail Center shown on the Site Plan attached to this Lease as Exhibit "A" is for informational purposes only and is not a warranty, representation or agreement on the part of Landlord that the Retail Center, retail store buildings and/or any additional retail store buildings will be exactly as indicated on such Site Plan or that the other actual or proposed tenants or occupants of the Retail Center shown on the Site Plan will become or remain occupants of the Retail Center.

1.2.11    Tenant's Pro Rata Share  Tenant's Pro Rata Share with respect to any costs hereunder shall equal the total of such costs multiplied by a fraction, the numerator of which shall equal the GLA of the Premises and the denominator of which shall equal the number of square feet of GLA in the Retail Center during the applicable year.

1.2.12    Tenant Work  The work to be performed by Tenant with respect to the Premises, which is more particularly described in the Work Requirements on the attached Exhibit "C-2".

1.3    Significance of Basic Lease Provisions and Definitions  Each reference in this Lease to any of the Basic Lease Provisions or Definitions contained in Sections 1.1 and 1.2 of this Article shall be deemed and construed to incorporate all of the terms thereof.  The Basic Lease Provisions and Definitions shall be construed in connection with and limited by any such reference.

ARTICLE II
DEMISED PREMISES AND TERM

2.1    Demise of Premises  Landlord hereby leases and demises to Tenant and Tenant rents from Landlord the Premises, subject to the terms and conditions herein contained, and all encumbrances, easements and restrictions as may be amended, revised or supplemented from time to time (collectively, the "CC&Rs"), zoning laws, and governmental or other regulations affecting the Retail Center.  It is Tenant's obligation to determine whether the Premises comply with those governmental laws and regulations applicable to Tenant's intended use of the Premises. If Landlord has not delivered possession of the Premises to Tenant with all Landlord's Work substantially completed (such delivery being "Delivery of Possession") by the Anticipated Delivery Date, Landlord shall not be liable to Tenant for any loss or damage resulting from such delay.  Notwithstanding the foregoing, if Landlord is unable to cause Delivery of Possession to occur by the Delivery Deadline, then the Tenant may terminate this Lease by delivering written notice of such termination to Landlord prior to the occurrence of Delivery of Possession, and following such termination the parties shall have no further rights or obligations hereunder except as may expressly survive the termination of this Lease.  The term "Delivery Deadline" shall mean December 31, 2014, provided that the Delivery Deadline will be extended by one day for each day of delay caused by (i) a Tenant Delay (as defined below), (ii) force majeure delays, as described and defined in Section 20.9 below, and/or (iii) delays in Landlord's receipt of permits to conduct the Landlord's Work that are beyond Landlord's reasonable control.

2.2    Condition of Premises  Tenant's taking of possession of the Premises shall be conclusive evidence of Tenant's acceptance thereof in good order and satisfactory condition, appropriate for Tenant's intended use.  Tenant agrees that no representations respecting the condition of the Premises and that no promises to decorate, alter, repair or improve the Premises, either before or after the execution hereof, have been made by Landlord or its agents to Tenant unless the same are contained herein or made a part hereof, it being expressly understood and agreed that Tenant shall accept Premises in an "as is" condition at the time of Tenant's taking of possession.  Tenant further agrees that no representations have been made to Tenant that any other tenants have leased or will continue to lease space within the Retail Center or that Tenant has any exclusive right to sell merchandise of any type and character except as provided in Section 6.5.1, it being understood that Landlord reserves the right to lease other space in the Retail Center to tenants selling merchandise similar to the merchandise to be sold by Tenant.  Landlord shall perform all Landlord's Work in the Premises set forth in the attached Exhibit "C-1", and Tenant shall perform all Tenant's

EXHIBIT  A

PAGE  8  OF  52

Exhibit 1 - Page 20

Work in the Premises in accordance with attached Exhibit "C-2". After all Landlord's Work has been completed, Landlord may remeasure the GLA of the Premises in which event Section 1.1.14 of this Lease will be revised accordingly, which revisions shall be confirmed in the Confirmation of Lease Term attached as Exhibit "E".

2.3    Reserved Use by Landlord  The Premises shall include only the appurtenances specifically granted in this Lease. Landlord specifically excepts and reserves to itself the roof, the air space above the drop ceiling, the space below the floor slab, and the exterior portions of the Premises (other than the storefront), and the right to install, maintain, use, repair and replace pipes, ductwork, conduits, utility lines, columns, and wires in the area between the roof and the drop ceiling, through column space and perimeter and demising walls, in or beneath the floor slab or above or below the Premises servicing other parts of the Retail Center.

2.4    Quiet Enjoyment  So long as Tenant is not in default of the Lease beyond applicable notice and cure periods, Tenant shall peaceably and quietly have, hold and enjoy the Premises during the Term, subject only to the terms of this Lease and the rights of those whose rights in the Retail Center predate or are otherwise superior to this Lease.

2.5    Intentionally Omitted  Term  The term of this Lease (the "Term") shall commence upon the execution hereof and shall end on the Expiration Date set forth in Section 1.1.12. All monetary obligations of Tenant, including monthly installments of Minimum Rent, shall begin to accrue on the Rent Commencement Date, as set forth in the Basic Lease Provisions. The Rent Commencement Date shall be the date set forth in Section 1.1.11, and Landlord shall be deemed to have delivered possession of the Premises to Tenant on the date Landlord has substantially completed the Landlord Work, which shall be deemed to have occurred when the Landlord Work, other than punch list items, has been completed; provided, however, if Landlord is delayed in completing the Landlord Work, in whole or in part, by an act or omission of Tenant (a "Tenant Delay"), the Rent Commencement Date shall be advanced by the number of days which is equal to the total number of days of Tenant Delay.

2.7    Options to Extend

So long as Tenant is not in default of this Lease beyond applicable notice and cure periods, Tenant shall have the right to extend the Term for two (2) successive periods of five (5) years each (the "Options to Extend"). Tenant shall exercise each Option to Extend by delivering to Landlord written notice of such exercise not less than 180 days prior to the last day of the then expiring term. Other than as set forth in this Section 2.7, Tenant shall have no further option to extend this Lease. The giving of such notice shall be sufficient to make the Lease binding on the parties for the extended term in question without further action of the parties. Each extended term shall commence on the day following the date of expiration of the immediately preceding term. The terms and conditions of the Lease for the extended terms shall be identical to the immediately preceding term except for (i) Minimum Rent, which shall be as set forth in Section 1.1.14 above for each extension term, (ii) there shall be no limitations on adjustments to the Operating Charges pursuant to Section 3.4.3 below, (iii) no tenant improvement allowance will be provided, and (iv) no Landlord Work or other improvements to the Premises by Landlord shall be applicable during the extended term.

2.8    Right of First Offer

Throughout the Term, so long as Tenant is not in default of the Lease beyond applicable notice and cure periods and Tenant has not assigned the Lease or subleased the Premises, Tenant shall have the right of first offer in accordance with the terms of this paragraph (the "First Offer Rights") to lease any space in the Building that is contiguous to the Premises as of the date hereof (the "First Offer Space") in the event that the First Offer Space becomes available to a new tenant in the future. In the event that Landlord desires to make a written offer to a third party or if Landlord desires to accept an offer from a third party to lease any First Offer Space, Landlord shall first present the material terms of the offer (the "Offer") to Tenant and give Tenant ten (10) days within which to determine whether tenant elects to accept the Offer. If Tenant gives Landlord written notice within such ten (10) day period that Tenant elects to accept the Offer, then Tenant shall be bound to enter into a written lease agreement (the form of which shall be substantially the same as this Lease) in accordance with the terms of the Offer within ten (10) days after the date that Landlord first presented the Offer to Tenant for consideration. If Tenant does not give Landlord such written notice within the ten (10) day period, then Landlord shall be free to lease the applicable First Offer Space to any party on terms substantially similar to the terms of the Offer, and Tenant's rights under this Section shall terminate.

EXHIBIT _A_

PAGE _9_ OF _52_

Exhibit 1 - Page 21

Notwithstanding the foregoing, the First Offer Rights described in this Section 2.8 are expressly subject and subordinate to (x) any and all rights of existing tenants at the Retail Center (and their successors and assigns) with respect to the First Offer Space, and (y) any and all rights with respect to the First Offer Space that are contained in existing leases of space at the Retail Center.

## ARTICLE III
### RENT AND OTHER CHARGES

3.1    Place of Payment  During the Term, Tenant covenants and agrees to pay to Landlord at the place designated in Section 1.1.4 hereof, without demand, deduction or setoff, all Rent as defined in Section 1.2.8 hereof.

3.2    Minimum Rent  Tenant shall pay to Landlord on or before five (5) days following the execution hereof the sum set forth in Section 1.1.16 hereof as prepaid rent applicable toward the first (1st) month's installment of Minimum Rent.  To the extent not already prepaid, on or before the Rent Commencement Date, Tenant shall pay to Landlord an amount equal to the first (1st) month's installment of Minimum Rent in the amount set forth in Section 1.1.14 hereof.  If the Rent Commencement Date shall not be the first (1st) day of the month, then the first (1st) month's installment of Minimum Rent shall be prorated based upon the ratio in which the number of days in such partial month bears to the total number of days in the month in which such partial month occurs.  On or before the first (1st) day of each and every calendar month following the Rent Commencement Date, Tenant agrees to pay Landlord in advance the monthly installment of Minimum Rent for each such month.Percentage Rent

3.3.1    Payment Obligation  As a further inducement for Landlord's entering into this Lease with Tenant, Tenant agrees, in addition to its covenant to pay Minimum Rent, to pay to Landlord in the manner and upon the conditions and at the times hereinafter set forth, as Percentage Rent, for each Lease Year, an amount equal to the product of Tenant's Gross Sales in excess of the Percentage Rate Breakpoint multiplied by the Percentage Rent Rate (the "Percentage Rent").  Percentage Rent shall be due and payable quarterly commencing on or before the fifteenth (15th) day of the first three (3) months of the first Lease Year, and on or before the fifteenth (15th) day of each third (3rd) month thereafter.  The last payment of Percentage Rent shall be made on or before the fifteenth (15th) day after the expiration or termination of the Term of this Lease and shall be for the Percentage Rent payable for the three (3) month period ending on the last day of the Lease Term.  During each three (3) month period in a Lease Year following the three (3) month period in such Lease Year in which Gross Sales exceeded the Percentage Rent Breakpoint, Tenant shall pay Landlord the Percentage Rent as calculated herein less the aggregate of Percentage Rent previously paid by Tenant during such Lease Year.

3.3.2    Gross Sales  "Gross Sales" means the sales price of all merchandise sold (including gift certificates) and the charges for all services performed by Tenant or any other person, firm or corporation selling merchandise or performing services in, upon, and from any part of the Premises, including rentals, mail or telephone orders received or filled at the Premises, all deposits not refunded to purchasers, all merchandise sold or services performed for cash or for credit, regardless of collections, or for any other consideration, and all insurance proceeds realized from loss of sales, profits and/or business.  Installment, credit or layaway sales shall be treated as a sale for the full price in the month in which such sale is made, regardless of when Tenant shall receive payment from its customer.  Gross sales shall not include  (i) sales, gross receipts or compensating taxes or other retail excise taxes imposed by any duly constituted governmental authority on sales collected by Tenant and paid to such authority; (ii) exchanges of merchandise between Tenant's stores unless for the purpose of consummating a sale made in, upon, or from the Premises; (iii) the sales price of goods delivered in exchange for goods returned to Tenant, or returned to the manufacturer, vendor or shipper; (iv) sales of fixtures that are not a part of Tenant's stock in trade; (v) credit card discounts; (vi) sales to employees of Tenant not to exceed three percent (3.0%) of Gross Sales; (vii) postage for mail order items; (vii) sales of fixtures, machinery and equipment, which are not stock in trade, after use thereof in the conduct of Tenant's business; (viii) the amount of any actual refunds or credits made by Tenant to a customer for returned merchandise or unaccepted services, the amount of which refund or credit was previously included in Gross Sales; (ix) Tenant's actual cost for alterations or repairs to customers' merchandise; (x) actual charges paid by Tenant for delivery and shipping of merchandise from the Premises to the buyer pursuant to retail sales transacted at the Premises; (xi) the amount of discounts to customers in the form of gift cards, gift certificates or coupons; provided, however, that the foregoing is not intended to exclude the sale of gift cards and gift certificates from Gross Sales, (xii) any interest received as a consequence of any credit that may be extended by Tenant; (xiii) the amount of

EXHIBIT ___A___

PAGE _10_ OF _52_

Exhibit 1 - Page 22

bad debts and bad checks resulting from sales made from the Premises which previously have been included in reported Gross Sales, after Tenant has made its customary collection efforts and written off such amounts as uncollectible, provided that the total bad debts and uncollectible amounts which may be excluded from Gross Sales for any particular year shall not exceed three percent (3.0%) for such year, and shall in any event be limited to amounts actually written off for Tenant's accounting purposes during such year, and if such amounts are subsequently collected, such amounts shall be included in Gross Sales in the applicable month and year in which they were collected; (xiv) bulk sales or sales of Tenant's inventory incidental to the cessation of business at the Premises, provided however that in no event shall the foregoing be deemed to exclude from Gross Sales any retail sales of Tenant's inventory to the general public; (xv) transfers or exchanges of merchandise between stores or warehouses of Tenant where such transfers or exchanges are made solely for the convenient operation of Tenant's business and not for the purpose of consummating a sale in a location other than the Premises; and (xvi) any moneys deposited in vending and other machines which are removed and retained by the owner, lessee or licensee thereof.

3.3.3    Reports    Tenant shall submit to Landlord on or before the fifteenth (15th) day of each calendar month during the Lease Term (including the fifteenth (15th) day of the month following the end of the Lease Term); together with the remittance of Percentage Rent then owing, a written statement signed by Tenant, and certified by it to be true and correct, showing in accurate detail the amount of Gross Sales for the preceding calendar month and from the beginning of the Lease Year to the end of such previous month or portion thereof. In addition to Tenant's monthly report of Gross Sales, Tenant shall submit to Landlord an annual report of Gross Sales not later than ninety (90) days following the end of each Lease Year and a final report not later than ninety (90) days following the termination of this Lease, showing Gross Sales in each such Lease Year. Each such report shall be certified as accurate by an officer of Tenant, confirming that such report has been prepared in accordance with generally accepted accounting principles consistently applied and accurately states the Gross Sales for the period of such report. All reports of Gross Sales shall set forth the amount of Minimum Rent paid, Percentage Rent due and paid, and shall contain such other details as Landlord shall reasonably require and shall be in a form reasonably acceptable to Landlord.

3.3.4    Books and Records    Tenant agrees that all Gross Sales shall be recorded on a daily basis in accordance with generally accepted accounting principles and registered at the time each sale is made in a commercially reasonably manner. Tenant shall keep and maintain (and shall cause any permissible subtenants to keep and maintain) in the Premises, or in its home office (provided Landlord shall have been notified in writing of the address at which the books and records are being maintained), full and accurate books of account and records from which Gross Sales can be determined (including, but not limited to, inventories and receipts of merchandise, telephone and mail order slips, all federal, state, and local sales tax returns, records of daily bank deposits of the entire receipts from transactions in, at, on, or from the Premises, sales slips, daily dated cash register tapes, sales books, duplicate bank deposit slips, and bank statements) which shall be conveniently segregated from other business matters. Such records shall be preserved (properly totaled) for at least thirty-six (36) months after the end of the period in question.

3.3.5    Inspection and Audit    Landlord shall have the right at any time during regular business hours to inspect and audit all books, records, papers and files of Tenant relating to Gross Sales and Tenant shall make the same available to Landlord upon demand. If at any time Landlord shall contend that any error may exist with respect to any of Tenant's monthly or annual Gross Sales reports, then Tenant's books, records, papers, and files for any such Gross Sales report shall be kept and maintained by Tenant until Landlord's contention has been finally determined, even if longer than the thirty-six (36) month period provided for above. If any such audit shows that the amount of Gross Sales on any monthly or annual Gross Sales report delivered to Landlord by Tenant was understated by more than five percent (5%), then Tenant shall pay Landlord the cost of its audit and investigation as Additional Rent as well as any deficiency in Percentage Rent due.

3.4    Operating Charges

3.4.1    Operating Charges    "Operating Charges" means Landlord's total costs (including appropriate reserves) for operating, managing, administering, maintaining, repairing, replacing, or improving the Common Area Retail Facilities, Landlord's total costs for all insurance covering the Retail Center, and the cost of all deductibles paid by Landlord. Without limitation of the generality of the foregoing, Operating Charges shall include the cost to

EXHIBIT ___A___

PAGE __11__ OF _52_

Exhibit 1 - Page 23

Landlord of the following:  premiums for insurance policies whether under master or blanket policies or separate policies, and shall include, without limitation, commercial general liability insurance for personal injury, wrongful arrest or detainer, death and property damage; all risk (special form) insurance; rent insurance; workers' compensation insurance; and fidelity bonds for personnel; lighting, cleaning, snow and ice removal, landscaping, painting, policing, providing security (if Landlord shall so elect), fire protection, drainage, heating, ventilating, and air conditioning; depreciation of machinery and equipment used in connection with the Retail Center and the maintenance thereof, the maintenance and repairs of the buildings in the Retail Center, the maintenance and operation of any sprinkler system installed in the Retail Center; costs paid by Landlord for maintenance and repair of common areas pursuant to any CC&Rs; costs incurred in complying with governmental laws, ordinances, rules and regulations enacted after the date of this Lease, together with Landlord's expenses in determining the amount of any charges or assessments levied on the Retail Center; all costs identified as Operating Charges in Section 10.1 below, and all costs incurred by Landlord in managing the Retail Center; provided, however, capital improvements or capital equipment purchases shall only be included in Operating Charges to the extent the cost of such capital improvements or equipment is amortized over the useful life of such capital item, in each case with interest on the unamortized balance at a rate of ten percent (10%) per annum.  Tenant shall also pay an amount for administration equal to ten percent (10%) of the Tenant's Pro Rata Share of the Operating Charges.

Notwithstanding the foregoing, the following costs and expenses shall be excluded from Operating Charges: (i) depreciation or, except as expressly permitted in this Section 3.4.1, amortization; (ii) interest on and amortization of debts; (iii) tenant improvements; (iv) leasing commissions, attorney's fees and other expenses incurred in connection with this Lease and with leasing, renovating, or improving space for other tenants or prospective tenants; (v) costs associated with the collection of rent under any lease or defense of Landlord's title to or interests in the Retail Center; (vi) refinancing costs; (vii) expenses in connection with services or other benefits which are offered to other tenants but not to Tenant; (viii) damages recoverable by any occupant due to violation by Landlord of any of the terms and conditions of this Lease or any other lease relating to the Retail Center; (xi) costs and expenses incurred by Landlord exclusively for the benefit of specific tenants of the Retail Center; (x) advertising and promotional expenses; (xi) fines and penalties incurred due to violations by Landlord of any governmental laws, ordinances, rules and regulations; (xii) all overhead, costs and expenses associated with the operation of Landlord's business, as distinguished from costs and expenses associated with the operation of the Retail Center, such as, without limitation, corporate accounting and legal fees, costs and expense of defending or prosecuting litigation not related to the Retail Center, and costs and expenses of selling, syndicating, financing or mortgaging Landlord's interest in the Retail Center; (xiii) expenses for repairs, maintenance or replacements for which Landlord is reimbursed from or pursuant to insurance, warranties, or condemnation proceeds (or for which Landlord would have been so reimbursed had it maintained the insurance required hereunder); (xiv) services, items and benefits for which any tenant of the Retail Center (including Tenant) specifically reimburses Landlord (except for costs represented by Operating Charges) or for which such tenant pays third persons; (xv) intentionally omitted; (xvi) contributions to charitable organizations; (xvii) fees, costs, reimbursement and other sums paid to affiliates of Landlord for services provided to the Retail Center to the extent that such fees, costs, reimbursements or other sums are in excess of prevailing market amounts for comparable services provided by unaffiliated third parties; (xviii) cost of any work or services to the extent performed for any facility other than the Retail Center, provided that Landlord shall have the right to reasonably allocate the cost of services provided to more than one facility); (xix) salaries and the cost of other benefits of officers and executives of Landlord above the level of property manager or partners, officers, managers, employees or executives of Landlord or any managing agent not connected with the operation of the Retail Center; (xx) costs of compliance with any governmental laws, ordinances, rules and regulations (including the Americans with Disabilities Act) in effect as of the date of this Lease; (xxi) costs incurred to correct any structural or latent defect in the original construction of any portion of the Retail Center or incurred as the result of any Hazardous Materials existing on, under or around the Retail Center on or prior to the Commencement Date; (xxii) intentionally omitted; (xxiii) legal and court costs, including attorney's fees, and expenses incurred by Landlord in which it is not found to be the prevailing party; (xxiv) reserves for maintenance, repairs and replacements, except to the extent actually utilized for such purposes; (xxv) capital expenditures related to any new improvements (not including replacements of existing improvements that Landlord is otherwise entitled to include in Operating Charges pursuant to this Lease); and (xxv) any other costs or expenses expressly identified in this Lease as being at the "sole cost" or "sole expense" of Landlord.

EXHIBIT A
PAGE 12 OF 52

Exhibit 1 - Page 24

3.4.2    Payment Obligation  Along with payment of Minimum Rent (once payment of Minimum Rent has commenced), Tenant shall pay to Landlord in advance, without demand, deduction or setoff, on the Delivery Date and on the first (1st) day of each and every calendar month following the Delivery Date, the monthly installment of Tenant's Pro Rata Share of Operating Charges.  If the Delivery Date shall not be the first (1st) day of the month, then the first monthly installment of such Rent shall be prorated accordingly.  The portion of the Operating Charges required to be paid by Tenant shall be based upon Landlord's estimate thereof.  Within one hundred twenty days (120) after the end of each calendar year, the exact amount of the Tenant's Pro Rata Share of the Operating Charges for such calendar year shall be determined by Landlord and a statement thereof shall be submitted to Tenant (an "Operating Charges Statement").  If the total amount of Operating Charges for which Tenant is responsible is more than the actual amount received from Tenant during such year, Tenant shall pay to Landlord the difference between the amount paid and the actual amount due within ten (10) days after demand therefor by Landlord; and if the total amount paid by Tenant for such Operating Charges for such year shall exceed such actual amount due from Tenant for such year, such excess shall be credited against payments hereunder next due or if no payments are next due, refunded by Landlord.

3.4.3    Cap on Controllable Operating Charges.  During the initial Term of this Lease only, Landlord agrees that Controllable Operating Charges for each calendar year following the first full calendar year of the term of this Lease shall not increase by more than five percent (5%) each calendar year, noncumulative.  "Controllable Operating Charges" means those Operating Charges that Landlord controls and shall not include insurance premiums, deductibles, utility charge, Real Estate Taxes, snow removal costs, trash removal costs, emergency maintenance expenditures, capital maintenance expenditures, and the administration fee.

3.4.4    Audit Right.  Tenant may elect, by written notice to Landlord delivered within thirty (30) days after Tenant's receipt of the Operating Charges Statement, to inspect, at Tenant's cost and using a Qualified Person (as defined below), Landlord's records pertaining to the computation of Operating Charges and Taxes to verify the accuracy of such Operating Charges Statement, so long as Tenant complies with the provisions of this Section 3.4.4.
    If Tenant elects to exercise such inspection right, then (i) Tenant shall complete such audit and inspection within 60 days following the receipt of the Operating Charges Statement pertaining to the year in question, provided Landlord does not unreasonably delay Tenant's exercise of its inspection right; and (ii) Tenant shall provide Landlord with not less than ten (10) business days prior written notice of the date on which such Qualified Person desires to examine Landlord's books and records, and the parties shall reasonably agree upon a date when such inspection shall be conducted.  Such inspection, if any, shall be conducted during Landlord's normal business hours in the Landlord's offices.  Tenant shall provide to Landlord a copy of the audit report.  Tenant shall keep the report confidential and shall not share the contents, results, or the fact that Tenant is investigating the Operating Charges or the Taxes, or adjustments with any other person, except for its advisors on a need-to-know basis.  Tenant shall pay to Landlord within ten (10) days following its inspection any amount determined to be owing by Tenant  Landlord shall promptly correct any errors disclosed by the review unless there is a dispute as to the final amount of Operating Charges payable by Tenant.  In the event of any such dispute, a determination by a public accounting firm of national standing selected by Landlord as to the amount thereof shall be binding and conclusive upon both Landlord and Tenant.  If the Operating Charges for any given year are overstated by more than five percent (5%), Landlord shall reimburse Tenant for the actual and reasonable out-of-pocket costs of its audit.  If Tenant does not deliver written notice to Landlord exercising its inspection rights under this Section 3.4.4 within thirty (30) days of receiving any Operating Charges Statement, such inspection right shall be deemed waived with respect to such Operating Charges Statement and the Operating Charges Statement shall be conclusive and binding on Tenant.  "Qualified Person" means a certified public accountant paid on an hourly basis (and not a contingent fee basis) or other person experienced in accounting for income and expenses of retail stores, provided that such person is paid on an hourly basis (and not a contingent fee basis).

3.5    Real Estate Taxes

3.5.1    Real Estate Taxes  "Real Estate Taxes" means all taxes, levies, public charges, use charges and assessments of whatever nature (whether or not now customary or within the contemplation of the parties and regardless of whether the same shall be extraordinary or ordinary, foreseen or unforeseen), directly or indirectly assessed or imposed upon the land, buildings, improvements and personal property of that portion of the Retail Center upon which Landlord is from time to time obligated to pay taxes, including all costs and fees incurred by

{00214507;7}                                              9

EXHIBIT  A
PAGE  13  OF  52

Exhibit 1 - Page 25

Landlord in contesting same or in negotiating with the public authorities as to same. "Real Estate Taxes" shall not include any municipal, county, state or federal income, inheritance or franchise taxes of Landlord, transfer taxes of Landlord in connection with the sale or other transfer of all or part of the Retail Center, and any penalties or interest due to Landlord's failure to pay taxes when due.

      3.5.2    <u>Payment Obligation</u> Along with payment of Minimum Rent (once payment of Minimum Rent has commenced), Tenant shall pay to Landlord in advance, without demand, deduction or set-off, on the Delivery Date and on the first (1st) day of each and every calendar month following the Delivery Date, a monthly installment of Tenant's Pro Rata Share of Real Estate Taxes based on Landlord's estimate thereof. If the Delivery Date shall not be on the first (1st) day of the month, then the first monthly installment of such Rent shall be prorated accordingly. Within a reasonable time of receipt of the tax bills for each tax year, Landlord will deliver to Tenant a statement reflecting the total amount of taxes payable by Landlord and the amount of Tenant's estimated share. Tenant shall pay any deficiency within ten (10) days after demand therefor by Landlord and Landlord shall credit any excess payments against payments hereunder next due.

3.6    <u>Marketing</u> Tenant shall name the Retail Center in any of Tenant's advertising of Tenant's store at the Premises.

ARTICLE IV
<u>INTENTIONALLY OMITTED</u>

ARTICLE V
<u>UTILITIES</u>

      Tenant shall promptly pay when due all charges for utility services used in the Premises. Tenant shall install and pay the cost of all meters and sub-meters required in the measurement of Tenant's usage unless already installed by Landlord or the applicable utility company. Tenant shall apply to the applicable utility company or municipality for all required utility services; provided, however, that should Landlord elect to furnish any utilities, Tenant agrees to purchase same from Landlord at rates not in excess of the cost if Tenant were to buy same directly from a utility company, and to pay Landlord upon demand the cost for such services. Landlord may, at its sole option, choose to furnish such utility services, but in the event Landlord ceases to provide such service, Landlord shall be responsible for reconnecting Tenant to all meters required in the measurement of Tenant's usage and Tenant shall again be responsible for payment directly to the appropriate utility companies. The charge for domestic water and trash compactor usage shall be reasonably determined by Landlord if provided by Landlord and shall be payable on a monthly basis (Tenant shall deposit any garbage, trash, rubbish or other refuse in designated receptacles provided by Landlord on a daily basis). Periodically, at the request of either Landlord or Tenant, Tenant's usage will be reviewed and an adjustment will be made in the monthly charge to reflect changes in the cost to Landlord or in Tenant's volume of usage. Neither Landlord, nor any company, firm, or individual operating, maintaining, managing, or supervising the plant or facilities furnishing utilities, or any of their respective agents, beneficiaries, or employees, shall be liable to Tenant or any of Tenant's employees, agents or anyone claiming through or under Tenant, for any damages, injuries, losses, expenses, claims, or causes of action, because of any interruption, curtailment or discontinuance at any time for any reason in the furnishing of utilities; nor shall any such interruption, curtailment or discontinuance be deemed an eviction or disturbance of Tenant's use or possession of the Premises or any part thereof; nor shall any such interruption, curtailment or discontinuance relieve Tenant from full performance of Tenant's obligations under this Lease. Landlord shall diligently pursue the reinstatement to the Premises of any such interrupted, curtailed or discontinued services, to the extent within Landlord's reasonable control.

ARTICLE VI
<u>USE OF PREMISES</u>

6.1    <u>Tenant's Use</u> Tenant shall use the Premises solely for the Permitted Use specified in Section 1.1.13 and for no other purpose whatsoever. The identity, skill, experience and reputation of Tenant, the specific character of Tenant's business, anticipated use of the Premises and the relationship between such use and other uses within the Retail Center have been a material factor in Landlord's entering into this Lease. Tenant shall open for business to the general public in the Premises, a fully-fixtured, stocked and staffed "Pharmaca" pharmacy on the Rent Commencement Date and thereafter, subject to Tenant's rights in Section 6.1.2 below, occupy one hundred percent

{00214507;7}                           10

EXHIBIT  A

PAGE  14  OF  52

Exhibit 1 - Page 26

(100%) of the Premises during the Term and shall use not less than eighty percent (80%) thereof as sales and display area. Any change in the character of Tenant's business, trade name or use shall constitute a material default under this Lease. Tenant acknowledges that Landlord would not have leased the Premises to Tenant absent Tenant's agreement to open for business in the Premises. Accordingly, during the term of this Lease, Tenant shall not, either directly or indirectly, own, operate or be financially interested in, either by itself or with others, a business like or similar to the business permitted to be conducted hereunder within a radius of two (2) miles of the perimeter of the Retail Center except for those which Tenant has in operation as of the date hereof. Without limiting Landlord's remedies, in the event Tenant should violate this covenant and Tenant is obligated to pay Percentage Rent, Landlord may, at its option, include the gross sales of such other business in the Gross Sales made from the Premises for the purpose of computing the Percentage Rent due hereunder.

      6.1.2    If Tenant complies with its obligations in Section 6.1.1, Tenant may thereafter cease to continuously operate Tenant's business in the Premises and such ceasing of continuous operations shall not be a default hereunder. In the event that Tenant ceases to continuously operate Tenant's business in the Premises for a period of longer than two (2) consecutive months, excluding closure due to casualty or remodeling, Landlord may terminate this Lease at any time upon prior written notice to Tenant. During any time period in which Tenant ceases to continuously operate Tenant's business on the Premises, Tenant shall continue to perform all of its obligations pursuant to this Lease, including, without limitation, payment of Minimum Rent, Additional Rent and all other charges due to Landlord under this Lease. If Tenant ceases to continuously operate Tenant's business in the Premises, Tenant shall give Landlord not less than thirty (30) days prior written notice of its election to cease to continuously operate Tenant's business in the Premises. Such notice shall contain: (1) the name, address and telephone number of its local representative authorized to allow access to the Premises during such vacancy, and (2) Tenant's closing date. In addition to continuing to perform all of its obligations pursuant to the Lease, Tenant covenants and agrees that so long as the Premises remain unoccupied:

      a)    Tenant shall keep the HVAC units in the Premises operating at a minimum temperature as to protect the Premises from any external weather conditions, i.e., damage due to freezing/thawing water pipes, mildew on the walls due to humidity, etc., which may adversely affect the Premises or any other contiguous space.

      b)    Except as set forth in this Lease, Tenant shall not remove its storefront signage without Landlord's prior written consent, and, if requested by Landlord, Tenant shall cover all exterior windows, from the interior of the Premises, in an attractive, professional manner as to minimize any unfavorable appearance from the exterior of the Retail Center.

      c)    For so long as the Premises are vacant and Tenant does not have a fully executed assignment or sublease to an approved party, Tenant shall grant to Landlord the ability and unrestricted right to show the Premises to any prospective parties which may have an interest in leasing the Premises. To accomplish such rights, Tenant shall direct its local representative named in the above-mentioned notice who is authorized to allow access to the Premises to use its commercially reasonable efforts to accommodate Landlord, and Landlord's agents, in showing the Premises. The foregoing notwithstanding, if Tenant's representative is a real estate agent/broker, Tenant shall be independently responsible for any brokerage fee that may be owed Tenant's agent in connection with Landlord's access and reletting. Tenant covenants and agrees to indemnify and hold Landlord harmless for the payment of such local representative in the event that Landlord's employees or agents lease the Premises.

      Failure of Tenant to adhere to the closing conditions heretofore stated shall be deemed a material default under this Lease and Tenant shall be deemed to have abandoned the Premises.

6.2    <u>Trade Name</u>. Tenant will conduct business in the Premises only under the trade name specified in Section 1.1.7.

6.3    <u>Legal Operation of Premises</u>  Tenant shall not use, or suffer or permit the Premises, or any part thereof, to be used for any purpose or use in violation of any law, ordinance or regulation of any governmental authority, or in any manner that will constitute a nuisance or an unreasonable annoyance to any occupant of the Retail Center, or in a manner that will injure the reputation of the Retail Center, or for any hazardous purpose or in any manner that will violate, suspend, void or serve to increase the premium rate of or make inoperative any policy or policies of insurance of any kind whatsoever at any time carried on any property, buildings or improvements in the Retail Center, or any part thereof, including the Premises.

6.4    <u>Operating Rules and Regulations</u>  Tenant shall abide by and adhere to the operating rules and regulations set forth in the attached <u>Exhibit "F"</u> and any other rules and regulations as Landlord may from time to time institute, provided, that such rules and regulations do not conflict with the terms of this Lease.  Any default or breach of such rules and regulations shall be deemed a default under this Lease and Landlord shall be entitled to exercise all rights and remedies available to Landlord as set forth in this Lease.

6.5    <u>Exclusive Use</u>

6.5.1    Landlord agrees that during the Term of this Lease Landlord shall not enter into a lease of space at the Retail Center permitting the tenant thereunder to (i) operate a pharmacy dispensing prescription medication, or (ii) operate a business primarily engaging in the sale of vitamins, minerals, dietary supplements or natural beauty care (collectively, "Exclusive Products"), all of the foregoing being for human use and consumption only (i.e., the foregoing shall not be applicable to products for animal use and consumption).  For purposes of clarification, a business shall be deemed to be "primarily" engaged in the sale of the Exclusive Products if it derives more than 10% of its gross sales at the Retail Center in a 12-month period from the sale of Exclusive Products.  The foregoing restrictions shall not apply to, and Landlord is expressly permitted to lease, license or otherwise permit space at the Retail Center to be used by, any of the following businesses offering Exclusive Products for sale: (x) a hair salon or other business offering hair cutting or similar type services, and/or (y) a beauty or spa tenant.  The exclusive use rights in this Section 6.5 shall automatically become null and void if any of the following occur at any time: (i) Tenant defaults under this Lease beyond any applicable notice and cure periods; (ii) Tenant directly or indirectly, transfers or assigns its rights under this Lease in whole or in part or sublets all or any portion of the Premises (except in connection with a Permitted Transfer, as defined in Section 15.1), or (iii) Tenant ceases for any period of time to continuously operate a full service pharmacy in the Premises throughout the Term  Notwithstanding the foregoing, this Section 6.5 shall not apply to existing leases at the Retail Center or to the tenants under existing leases or their successors; provided, that Landlord shall not amend, modify or supplement such leases so that such tenants have the right to operate as a pharmacy or to sell Exclusive Products.

6.5.2    Landlord shall not be in violation of this Section 6.5 until Tenant has notified Landlord of such violation in writing together with reasonable evidence of such violation and such violation is not cured within sixty (60) days of Tenant's notice.  If Landlord does not cure the violation within such sixty-day period, then Tenant's sole and exclusive remedy for such violation shall be to terminate this Lease upon written notice to Landlord of such termination, provided that Landlord does not cure such violation prior to the termination date.

ARTICLE VII
<u>SIGNS AND DISPLAYS</u>

Tenant shall not place, cause or permit to be placed and maintained on the exterior of the Premises any sign, awning or other advertising matter unless in compliance with Landlord's graphics and signage criteria attached hereto as <u>Exhibit "D"</u>, and will not place or maintain any decoration, lettering or advertising matter on the glass of any window or door of the Premises without Landlord's prior written consent.  Landlord reserves the right to update its graphics and signage criteria from time to time and, upon written notice from Landlord, Tenant shall update its signage in accordance with any new criteria.  Tenant shall install and maintain at all times displays of merchandise in the show windows of the Premises.  Any articles in the interior of the Premises that are visible from the exterior of the Premises ("Interior Display Items"), including, without limitation, any sign, placard, decoration, lettering, advertising matter, descriptive material, merchandise or fixtures, must comply with the following criteria:  (a) any signs are (i) professionally designed and manufactured; and (ii) used in substantially all of its (and its affiliates') stores operating under the Trade Name; (b) the Interior Display Items do not flash, blink or otherwise light in an

EXHIBIT  A

PAGE 10 OF 52

Exhibit 1 - Page 28

alternate fashion; (c) any signs do not individually exceed two (2) feet by three (3) feet in size, or in the aggregate exceed more than one-third (1/3) of the glass portion of the storefront; (d) the Interior Display Items are not taped or affixed to the glass of the storefront windows or doors; (e) hand lettered signs and flashing signs visible from the exterior of the Premises are prohibited; and (f) Tenant shall immediately upon order from Landlord remove any objectionable or offensive items, as determined by Landlord in its reasonable discretion. During the term of the Lease, Tenant may seek Landlord's general approval of Tenant's standard corporate signage and marking materials for display in the exterior windows at the Premises for pedestrian traffic by delivering to Landlord, for its review and approval, a set of sample materials that are representative of such standard signage and materials in general. Landlord will not unreasonably withhold its general approval, provided, however, that any signage and marketing materials subsequently generated in reliance upon such general approval must comply with all applicable laws and Retail Center criteria. Any such general approval shall be personal to Pharmaca Integrative Pharmacy, Inc. Tenant shall have the right to install (i) a "coming soon" promotional banner for its Trade Name on the exterior façade of the Premises for thirty (30) days prior to the date Tenant opens for business in the Premises, and a (ii) "grand opening" promotional banner for its Trade Name for thirty (30) days following the date Tenant opens for business in the Premises, so long as such signage complies with the graphics and signage requirements of this Lease and any applicable laws, codes or ordinances. Additionally, Tenant shall have the right, up to four (4) separate, non-overlapping times within each 12-month period during the Term, to install two promotional item banners, not to exceed a combined size of 32 square feet, in the window, door or on the exterior façade of the Premises for a period of up to thirty (30) consecutive days, so long as such signage complies with the graphics and signage requirements of this Lease and any applicable laws, codes or ordinances. Landlord agrees that if during the Term an appropriately sized signage panel position on the existing monument/pylon sign generally identifying the Retail Center and the tenants therein (the "Sign") becomes available, then in such event Landlord shall permit Tenant to use such vacant Sign panel position for Tenant's signage for the remainder of the Term (in accordance with the signage requirements set forth in this Lease).

## ARTICLE VIII
### ALTERATIONS TO PREMISES

8.1    Alterations to Premises  Tenant shall not alter the exterior of the Premises including the storefront and/or signs, heating, ventilating, air-conditioning or any sprinkler systems, and shall not make any structural alterations to the Premises or any part thereof or any alterations to any building, mechanical, plumbing or electrical systems without, in each instance, obtaining Landlord's prior written consent (the alterations generally described in this sentence being referred to as "Structural/Systems Alterations"). Tenant may, without Landlord's consent, make minor, nonstructural improvements and alterations, the aggregate cost of which shall not exceed Ten Thousand Dollars ($10,000.00) during any Lease Year, provided that such alterations or improvements are not Structural/Systems Alterations. Tenant agrees that any alterations made by it shall be performed pursuant to the Work Requirements attached as Exhibit "C-2" and shall become the property of Landlord upon the termination of this Lease and/or Tenant's right of possession. All alterations shall remain upon the Premises, unless Landlord shall require the restoration of the Premises to its original condition that existed after the completion of the Tenant's Work, in which event Tenant agrees to comply with such requirements prior to the expiration or other termination of this Lease. Without Landlord's prior written consent, Tenant shall not (i) cut or drill into or secure any fixture, apparatus or equipment of any kind to any part of the Premises, (ii) paint or decorate any part of the exterior of the Premises or any part of the interior of the Premises visible from the exterior thereof, or (iii) change the architectural treatment of the Premises. Tenant shall require its contractors to maintain insurance in amounts and in such form as Landlord may reasonably require. Tenant shall not use any portions of the Common Area Retail Facilities for any purpose in connection with the making of any alterations.

8.2    Compliance with Laws  All alterations shall be completed in a good, workmanlike and prompt manner and in compliance with all applicable laws. If any alterations which Tenant causes result in Landlord being required to make any alterations to any portion of the Retail Center to comply with applicable laws, Tenant shall reimburse Landlord upon demand for all costs and expenses incurred by Landlord in making such alterations.

8.3    Plans  When applying for Landlord's consent, Tenant shall furnish complete plans and specifications for the desired alterations and, if requested by Landlord, shall provide Landlord with an architectural review fee in the amount of Five Hundred Dollars ($500.00). Prior to commencement of the alterations, Tenant shall deliver to

EXHIBIT  A

PAGE  17  OF  52

Exhibit 1 - Page 29

Landlord any required building permit and other governmental authorization pertaining to the alterations. Within thirty (30) days after the completion of construction of any alterations, Tenant shall deliver to Landlord a full and complete set of "as built" drawings for such alterations.

8.4    Mandatory Refurbishing  If this Lease has a Term in excess of five (5) years, as a material inducement to receiving a lease term in excess of five (5) years, Tenant shall, to the extent Landlord reasonably believes the following items are no longer in a first class condition, refurbish, at Tenant's own expense, the interior of the Premises by replacement of wall coverings, repainting, carpeting, counters, lighting and trade fixtures at least every five (5) years, measured from the Rent Commencement Date or from the last refurbishing required by this Section, whichever is later. Tenant shall obtain Landlord's prior written approval, which approval shall not be unreasonably withheld, of the refurbishing required by this Section. The provisions of this Section shall in no event diminish Tenant's maintenance and repair obligations contained in this Lease, it being expressly understood and agreed that Tenant's maintenance and repair obligations under this Lease shall be in addition to the obligations contained in this Section.

ARTICLE IX
CONSTRUCTION LIENS

Any work performed by Tenant hereunder shall be performed pursuant to the Work Requirements attached as Exhibit "C-2" and upon completion thereof Tenant shall furnish Landlord with waivers and affidavits confirming that all contractors, subcontractors, laborers and materialmen who have performed work on the Premises or supplied materials incorporated therein have been paid in full. Such waivers and affidavits shall be in a form acceptable to Landlord and in accordance with the applicable Oregon statutes. Landlord may post and maintain on the Premises and record such notices of non-responsibility as are provided under Oregon mechanics' lien laws. Should mechanics', materialmen's or other liens or claims thereof be filed against the Premises or any portion of the Retail Center by reason of Tenant's acts or omissions or because of a claim against Tenant, Tenant shall cause the lien to be canceled and discharged of record by bond or otherwise within ten (10) days after receipt of notice from Landlord. Should Tenant fail to cause such lien to be so discharged or bonded, Tenant shall be in default hereunder, and Landlord may exercise any or all remedies available to Landlord under this Lease or in lieu thereof, Landlord may at its option, within the sixty (60) days next following Tenant's failure, discharge the same by paying the amount claimed to be due, and Tenant shall pay to Landlord on demand, as Additional Rent, the amount so paid and all costs and expenses incurred by Landlord, including reasonable attorneys' fees, in processing such discharge.

ARTICLE X
REPAIRS AND MAINTENANCE

10.1    Landlord Maintenance and Repairs  Landlord shall maintain, repair and make all necessary replacements to the Common Area Retail Facilities in accordance with standards then-prevailing for buildings of like age and character, and Tenant expressly acknowledges that the costs of such maintenance, repair and replacement constitute Operating Charges. Landlord shall maintain, repair and make all necessary replacements to the exterior supporting walls and other structural elements of the building that includes the Premises, the foundations, roof, and downspouting of the Premises in reasonable repair consistent with the standards then-prevailing for shopping centers of similar age and character, provided that Landlord shall have received prior written notice of the necessity for such repairs as same affect the Premises. Tenant expressly acknowledges that the costs of the maintenance, repairs and replacements described in the previous sentence constitute Operating Charges. Notwithstanding anything to the contrary herein, Tenant shall repair any and all damage to the Premises and the Retail Center that shall have been caused by the negligence of Tenant, its concessionaires, officers, agents, employees or licensees. Landlord shall, at its sole cost and expense, make all commercially reasonable repairs, replacements and alterations that may be needed to cause the Premises to be in compliance with those governmental laws, ordinances, rules and regulations applicable to the Premises that are required to be complied with by the permits for the conduct of the Landlord's Work issued by the applicable governmental authorities. Except to the extent of Landlord's gross negligence or willful misconduct, Landlord shall not be liable for any death or injury to any person or damage to any property arising out of any Landlord repairs or failure to perform repairs.

EXHIBIT __A__

PAGE _18_ OF _52_

Exhibit 1 - Page 30

10.2    _Tenant Maintenance and Repairs_  Tenant shall keep the interior of the Premises (together with the storefront and all windows and doors of the Premises which shall be cleaned and maintained by Tenant), and all electrical, plumbing, heating, ventilating, air conditioning, and any other mechanical installations therein (the "Equipment"), whether or not in or under the floor slab or on the roof of the Premises, in good working order, condition and repair including the replacement of the Equipment, fixtures and all broken glass (with glass of the same size and quality), at its expense.  Tenant shall promptly repair, at its expense, any damage to the Premises caused by bringing into the Premises any property for Tenant's use, or by the installation or removal of such property regardless of fault or by whom such damage may be caused, unless caused solely by the affirmative acts of Landlord, its agents or employees.  In the event Tenant fails to make such repairs, Landlord may, at its option, but need not, make same and Tenant agrees to pay Landlord as Additional Rent the cost thereof plus an additional twenty percent (20%) of such costs to cover Landlord's administrative and overhead costs promptly upon demand by Landlord.  Tenant shall not overload the floor slab, electric wiring and ventilation or utilities serving the Premises or located within the Premises and shall install at Tenant's sole expense, after first obtaining Landlord's written approval, any additional electric wiring that may be required in connection with Tenant's apparatus, equipment or fixtures.

10.3    Noxious Odors

If Tenant provides written notice to Landlord that noxious or offensive odors caused by Landlord or other tenants of the Retail Center are materially interfering with Tenant's business operations at the Premises, and Landlord determines that the presence of such noxious or offensive odors is inconsistent with the operating standards for shopping centers of similar age and character, then Landlord shall make commercially reasonable efforts to mitigate the odors' presence in the Premises.  However, Tenant expressly acknowledges that: (i) as of the date hereof, other tenants at the Retail Center include a veterinarian / pet care operation, hair salon and other retail and restaurant operations that emit odors in their ordinary course of operating, and (ii) the odors generated by such pre-existing tenants in their ordinary operations at the Retail Center shall not be deemed to constitute noxious or offensive odors under this Section 10.3.

## ARTICLE XI
### COMMON AREAS

11.1    _Control of Common Areas_  The Common Area Retail Facilities shall at all times be subject to the exclusive control and management of Landlord.  Landlord shall have the right from time to time to non-discriminatorily establish, modify and enforce reasonable rules and regulations with respect to all Common Area Retail Facilities.  Landlord shall have the further right from time to time to, among other things (A) close all or a portion of the Common Area Retail Facilities to such extent as may, in the opinion of Landlord, be legally sufficient to prevent a dedication thereof or the approval of any rights claimed by any person or the public therein; (B) close temporarily all or any portion of the parking areas or other Common Area Retail Facilities for construction, maintenance repair or replacement; (C) discourage non-customer parking; (D) to do and perform such other acts in and to the Common Area Retail Facilities as Landlord shall determine to be advisable according to good business practices; and (E) conduct, hold or organize events within the Common Area Retail Facilities.

11.2    _Alterations in the Common Areas_  Landlord reserves the right in its sole discretion to change, close, rearrange, relocate, alter or modify any and all of the Common Area Facilities or the buildings in the Retail Center so long as adequate facilities in common with other tenants are made available to Tenant.  Landlord specifically reserves the right to erect improvements on the parking areas, store buildings or other structures or improvements of any kind, including, but not limited to, extensions to existing buildings.  In furtherance, and not in limitation of the foregoing, Landlord shall have the right to erect additional stores, kiosks or other structures over or beside all or any part of the Common Area Retail Facilities and to erect in connection with the construction thereof or with any maintenance, repairs or replacements to the Common Area Retail Facilities or the Retail Center, temporary scaffolds and other aids to construction on the exterior of the Premises, provided that front and (if necessary for fire exiting purposes) rear access to the Premises shall not be denied Tenant.  If Landlord remodels or repaints the building in which the Premises is located, Tenant shall relocate Tenant's exterior signage on the Premises at Tenant's sole cost and expense.

EXHIBIT _A_

PAGE _19_ OF _52_

Exhibit 1 - Page 31

11.3    Non-Interference  Neither Tenant or any affiliates of Tenant shall take any action or have any communication with any governmental authority or entity to protest any possible redevelopment of the Retail Center or any potential tenant or potential use of the Retail Center, it being understood that Tenant's sole remedy with respect to any such matter shall be a breach of lease claim against Landlord under this Lease.

ARTICLE XII
INSURANCE

12.1    Insurance

12.1.1    Tenant Insurance.  Tenant shall keep in force at Tenant's expense during the Term hereof and during such other time as Tenant occupies the Premises or any part thereof, a commercial general liability insurance policy including bodily injury and property damage personal or advertising injury and medical payments (which policy shall likewise include insurance against all assumed or contractual liability of Tenant under this Lease), covering the Premises, Tenant's use thereof and any use of motor vehicles by Tenant within the Retail Center, in companies rated A or A+ by Best's rating service and in forms satisfactory to Landlord against claims for "personal injury" liability, including but not limited to, bodily injury, death or property damage with limits of not less than a combined single limit of Two Million and No/100 Dollars ($2,000,000.00).  Tenant shall also keep in force plate glass insurance and all-risk property and casualty insurance (special form) covering all leasehold improvements in the Premises (whether installed by Tenant or otherwise) and all of Tenant's property, including, but not limited to, Tenant's betterments and improvements, inventory, fixtures, furnishings, floor coverings, equipment and other property of Tenant whether or not removable by Tenant hereunder, which insurance shall be in an amount sufficient to cover the full replacement cost thereof (without deduction for depreciation) and of any repair or reconstruction from any hazard covered under an all-risk policy, including, without limitation, against damages to all such property caused by or attributable to water damage, including, but not limited to, sprinkler leakage or sprinkler flow, if applicable.  Tenant shall in addition keep in force and effect Workers' Compensation or similar insurance to the extent required by law.  All policies required to be obtained by Tenant pursuant to this Section shall name Landlord (and such other persons or firms as shall be specified by Landlord from time to time) as additional insureds, shall be primary and non-contributory and shall have deductibles of not more than Ten Thousand and No/100 Dollars ($10,000.00).  Tenant shall deposit the policy or policies of such insurance or a certificate or certificates thereof with Landlord no less than thirty (30) days after the execution hereof by Tenant and Landlord and evidence of all renewals of same not less than ten (10) days prior to the expiration date of such policy.  Should Tenant fail to carry or keep in force such insurance, Landlord may, but need not, cause such insurance to be issued and in such event Tenant agrees to pay as Additional Rent the premium for such insurance promptly upon Landlord's demand.  Such insurance coverage may be as a part of blanket coverage for all of Tenant's stores provided that such coverage shall be specifically endorsed to cover the Premises and shall otherwise be subject to the approval of Landlord, which approval shall not be unreasonably withheld.

12.1.2    Landlord will at all times throughout the Term carry: (a) insurance on the Retail Center (excluding the foundations and excavations) and the machinery, equipment and Retail Center systems (but excluding any property with respect to which Tenant is obliged to insure) against damage by fire and extended perils coverage in an amount equal to the full replacement cost thereof with such reasonable deductions as would be carried by a prudent owner of a reasonably similar shopping center building, having regard to size, age and location; and (b) public liability and property damage insurance in such reasonable amounts and with such reasonable deductions as would be carried by a prudent owner of a reasonably similar shopping center building, having regard to size, age and location.

12.2    Increase in Insurance Premiums  Tenant shall not do or suffer to be done, or keep or suffer to be kept, anything in, upon or about the Premises which will contravene Landlord's insurance policies or which will prevent Landlord from securing such policies in companies acceptable to Landlord.  If anything done, permitted to be done or suffered to be done by Tenant, or kept or suffered by Tenant to be kept in, upon and about the Premises shall cause the rate of all-risk insurance on the Premises or the Retail Center in companies acceptable to Landlord to be increased beyond the minimum rate from time to time applicable to the Premises or the Retail Center for the Permitted Use, Tenant shall pay as Additional Rent the amount of any such increase promptly upon demand by Landlord and shall cease such action until such payment is made.

EXHIBIT ___A___

PAGE _20_ OF _52_

Exhibit 1 - Page 32

12.3    Waiver of Subrogation  Landlord and Tenant (for themselves and for their insurers) each hereby waive any and all rights to recover against the other, for any loss or damage to such waiving party arising from any cause covered by all-risk property and casualty insurance (special coverage).  In furtherance of the foregoing, Landlord and Tenant will each cause their respective insurers to issue appropriate waiver of subrogation rights endorsements (to the extent that such rights are not waived in the policies themselves) to such all-risk property and casualty insurance (special coverage) policies of insurance.

12.4    Mutual Releases  Landlord hereby releases Tenant from any liability from any and all claims or damages arising out of Tenant's uses of the Common Area Retail Facilities, regardless of responsibility, to the extent such claims or damages are covered by insurance proceeds received by Landlord and Tenant hereby releases Landlord from any and all claims or damages arising out of Landlord's use of the Premises, regardless of responsibility, to the extent such claims or damages are covered by insurance proceeds received by Tenant.

ARTICLE XIII<br>HAZARDOUS MATERIALS

Tenant neither has nor will it allow any person to  (1) install on the Premises or the Retail Center any friable asbestos or any substance containing asbestos (which is included in the definition of Hazardous Materials) or (2) use, store, release or dispose of any Hazardous Materials in, on, about or under the Premises or the Retail Center, except in accordance with applicable law and normal business practices for similar projects similar in use to the Premises. From time to time during the Term of the Lease, Tenant agrees to submit, at its own expense, if requested by Landlord, report(s), satisfactory to Landlord in reasonable discretion, prepared by consultant(s) approved by Landlord, certifying that the Premises is not then being used nor has it been used in the past for any activities involving, directly or indirectly, the use, generation, treatment, storage or disposal of any Hazardous Materials; provided, however, that so long as Tenant has not breached any term or provision contained in this Article XIII, Tenant shall only be responsible for the cost and expense of such a report once during the Term and Landlord shall be responsible for the cost and expense of any additional reports.  In the event of a Hazardous Materials Claim or if Hazardous Materials are discovered in, on about or under the Premises, Tenant, at its sole cost and expense, shall comply with all Hazardous Materials Laws relative to such Hazardous Materials, pay immediately when due the cost of removal of any such Hazardous Materials and keep the Premises free of any lien imposed pursuant to such Hazardous Materials Laws.  In the event Tenant fails to comply with the provisions of this Paragraph within fifteen (15) days after notice of noncompliance or such shorter period as is mandated by applicable law or, if compliance is not feasible within such fifteen (15) days or shorter period, if Tenant shall fail to commence a program aimed at compliance with such provisions, which program is satisfactory to Landlord, in its sole and absolute discretion, Landlord may declare a default of this Lease and/or cause the Hazardous Materials to be removed from the Premises. Tenant shall give to Landlord, its agents and employees access to the Premises and hereby specifically grants to Landlord, for the Term of this Lease, a license to enter upon the Premises for the purposes of conducting tests and investigations for Hazardous Materials (subject to the requirements of Article XIX).  If any Hazardous Materials are caused to be removed from the Premises by Tenant or Landlord, the Environmental Protection Agency number, manifest number, manifest number or similar identification assigned to the Hazardous Materials so removed shall be solely in the name of Tenant and Tenant shall assume all liability for such removed Hazardous Materials.

Landlord represents and warrants to Tenant that to the best of Landlord's knowledge, at the time of delivery of the Premises by Landlord to Tenant, the Premises does not presently contain any Hazardous Materials in violation of Hazardous Materials Laws.  To the extent any Hazardous Materials in violation of Hazardous Materials Laws are present in, at or about the Premises or Retail Center prior to the time possession of the Premises is delivered to Tenant, then Landlord shall remediate and remove such Hazardous Materials as required by, and in full compliance with, all applicable Hazardous Materials Laws. Landlord shall protect, indemnify and save Tenant harmless from, all damages, losses, claims and liabilities imposed upon, incurred by or asserted against Tenant by reason of Landlord's failure to fulfill its remediation and removal requirements set forth in the previous sentence.

Exhibit 1 - Page 33

## ARTICLE XIV
## SUBORDINATION AND ATTORNMENT

14.1    Subordination  Landlord and Tenant agree that this Lease be and hereby is made subject and subordinate at all times to the CC&Rs and to all ground and underlying leases and to all mortgages in any amounts, and all advances thereon which may now or hereafter affect such leases or the Retail Center and to all renewals, modifications, consolidations, participation, replacements, and extensions thereof.  The term "mortgage" as used herein shall be deemed to include a bond, trust indenture, and deed of trust.  The aforesaid provisions shall be self-operative and no further instrument of subordination shall be required to evidence such subordination.  If Landlord or such lessor or mortgagee desires confirmation of such subordination, Tenant shall execute within fifteen (15) days after request and without charge therefor, any subordination agreement or certificate that may be reasonably requested; provided, that such lessor or mortgagee confirms in such subordination agreement or certificate that Tenant's possession of the Premises shall not be disturbed upon any foreclosure of the mortgage or deed of trust so long as Tenant is not in default of the Lease beyond applicable notice and cure periods.

14.2    Succession to Landlord's Interest; Attornment  Nothing contained in this Lease shall in any manner restrict Landlord's right to assign or encumber this Lease or to sell, convey or transfer its interest in the Retail Center.  Should Landlord sell, convey or transfer its interest in the Retail Center, or should Landlord enter into a mortgage affecting Landlord's fee interest or leasehold interest, as the case may be, in the Retail Center or a sale/leaseback transaction, Tenant shall be bound to any successor to Landlord in title or interest under all the terms, covenants and conditions of this Lease for the balance of the term hereof remaining after such succession, and Tenant shall without further documentation be conclusively deemed to have attorned to such succeeding party as its landlord under this Lease promptly upon any such succession.  Landlord shall be relieved of any and all obligations to Tenant hereunder arising subsequent to the transfer by Landlord of its title or interest in the Retail Center promptly upon the assumption of said obligation by Landlord's successor.  Tenant agrees that should any party so succeeding to the interest of Landlord require a separate agreement of attornment regarding the matters covered by this Lease, then Tenant shall enter into any such "attornment agreement".

14.3    Estoppel Certificate  Within fifteen (15) days after request therefor by Landlord, or in the event that upon any sale, assignment or hypothecation of the Premises and/or the land thereunder by Landlord an estoppel certificate shall be required from Tenant, Tenant agrees to deliver without charge, in recordable form, a certificate to any mortgagee or purchaser, or to Landlord or any person, firm or corporation specified by Landlord, certifying that this Lease is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified, and stating the modifications), that there are no defenses or offsets thereto (or stating those claimed by Tenant), the dates to which Minimum Rent, Percentage Rent and other charges have been paid and the Term of this Lease.

## ARTICLE XV
## TRANSFERS, ASSIGNMENT AND SUBLETTING

15.1    Covenant Not to Assign or Sublet Without Consent  Tenant covenants that it will not assign, mortgage, or encumber this Lease, nor sublease the Premises, or permit the Premises or any part of the Premises to be used or occupied by others, without the prior written consent of Landlord in each instance which shall not be unreasonably withheld.  The transfer of control or of a majority of the issued and outstanding capital stock of any corporate tenant or subtenant, however accomplished, and whether in a single transaction or in a series of transactions, will be an assignment of this Lease or of such sublease requiring Landlord's prior written consent in each instance. Notwithstanding anything contained in the preceding sentence, the provisions of the preceding sentence shall not apply to any corporate tenant whose shares are traded on a nationally-recognized securities exchange.

Notwithstanding any provision herein to the contrary, so long as Tenant is not in default of the Lease, Tenant shall have the right to assign this Lease or sublet all or any part of the Premises, without Landlord's consent, to: (i) an entity that results from an organizational change of Tenant or the division of Tenant into two or more entities; (ii)  to an entity that controls, is controlled by, or under common control with, Tenant (an "Affiliate"), or (iii) in connection with the merger, acquisition or reorganization of Tenant or its Affiliate, sale of substantially all of Tenant's assets, or in connection with the issuance, redemption or transfer of any portion of Tenant's stock (a "Permitted Transfer"),

{00214507;7}                          18

EXHIBIT  A

PAGE  22  OF  52

Exhibit 1 - Page 34

provided, however: (a) Tenant shall not be released from its obligations under this Lease, (b) Landlord shall be given a copy of the document effecting the transfer and evidencing the assumption of the Lease by the Affiliate of Tenant within 15 days after the date on which the assignment occurred, and (c) from and after the date of the assignment, Tenant shall be jointly and severally liable with the new tenant with respect to all obligations of Tenant under this Lease.

15.2    <u>Conditions for Landlord's Consent</u>  Landlord and Tenant hereby agree that the granting of consent by Landlord shall, at a minimum, be preconditioned upon the fulfillment of the following requirements of Landlord, which Tenant has reviewed and hereby agrees to be reasonable requirements of Landlord

15.2.1    Landlord shall be provided with at least thirty (30) days' written notice prior to any proposed assignment or subletting;

15.2.2    Tenant shall remain primarily liable under this Lease and shall guarantee the Lease if Landlord so requests;

15.2.3    Any proposed assignee or sublessee shall assume, in written instrument acceptable to Landlord, all of the obligations of Tenant hereunder;

15.2.4    The Premises shall remain intact and shall not be altered in any manner whatsoever;

15.2.5    The net worth of the proposed subtenant/assignee must be at least equal to the greater of Tenant's net worth immediately preceding the proposed transfer or Tenant's net worth on the date of this Lease;

15.2.6    The business reputation of the proposed subtenant/assignee must be at least equal to that of Tenant;

15.2.7    The managerial and operational skills of the proposed subtenant/assignee must be at least equal to those of Tenant;

15.2.8    Any use of the Premises by the proposed sublessee/assignee is permitted under this Lease and/or will not violate or create any potential violation of any laws, nor will it violate any other agreements affecting the Premises, the Retail Center, or Landlord;

15.2.9    The proposed subtenant/assignee will not create traffic congestion or an unreasonable burden on existing parking; and

15.2.10    Tenant shall pay up to $2,500 (such amount to be adjusted for inflation subsequent to the date of this Lease) of Landlord's reasonable attorney's fees or other costs associated with Landlord's review and approval of a prospective assignee or sublessee.

15.3    <u>Assignment in Violation of Article</u>  Any assignment or sublease in violation of this Article shall be deemed void ab initio.  No occupancy by any party other than Tenant or collection of rent by Landlord will be deemed (A) a waiver of provisions of this Article, or (B) the acceptance of the assignee, subtenant, or occupancy as tenant, or (C) a release of Tenant from the further performance by Tenant of covenants on the part of Tenant contained in this Lease. The consent by Landlord to an assignment or sublease will not be construed to relieve Tenant from obtaining Landlord's prior written consent in writing to any further assignment or sublease.  No permitted subtenant shall have the right to assign or encumber its sublease or further sublease all or any portion of its subleased space or otherwise permit the subleased space or any part of its subleased space to be used or occupied by others.

15.4    <u>No Claim for Damages</u>  Tenant's sole remedy for Landlord's refusal to consent to a proposed assignee or sublessee of Tenant will be an action or proceeding for specific performance, injunction, or declaratory judgment.

EXHIBIT ___A___

PAGE _23_ OF _52_

Exhibit 1 - Page 35

ARTICLE XVI
DAMAGE TO PREMISES; EMINENT DOMAIN; INDEMNITY

16.1     Damage  Except as provided otherwise below, in the event the Premises or Retail Center are damaged by fire, explosion, or other casualty or occurrence, and such damage is of such a character that the same can, in the ordinary course, commercially reasonably be expected to be repaired within two hundred seventy (270) days from the date of such casualty (as reasonably determined by Landlord, after accounting for all applicable factors, including time for claims adjustment and permitting), the damage shall be repaired with due diligence by Landlord at Landlord's expense; provided, however, that Landlord in no event shall be required to expend for such repair an amount in excess of the net insurance proceeds received by Landlord as a result of such damage.  Landlord shall proceed with reasonable diligence to determine the estimated time necessary to repair the damage.  Landlord shall give written notice to Tenant stating Landlord's estimate of the time necessary to repair or restore the damage. Notwithstanding the foregoing, in the event of any such damage in which (A) Landlord reasonably determines that such damage cannot, in the ordinary course, commercially reasonably be expected to be repaired within two hundred seventy (270) days from the date of such casualty (after accounting for all applicable factors, including time for claims adjustment and permitting), (B) any mortgagee then holding a mortgage on the Property or any interest of Landlord therein, should require that insurance proceeds payable as a result of such damage be applied to the mortgage debt, (C) the damage is caused by any occurrence not covered by Landlord's insurance, or (D) either the Retail Center or the building of which the Premises are a part is damaged within the last three (3) years of the Lease Term to the extent of twenty-five percent (25%) or more of the insurable value, Landlord may elect either to repair or to rebuild the Premises or the building in which the Premises are located or to terminate this Lease upon giving notice of such election in writing to Tenant within ninety (90) days of the happening of the event causing the damage; provided, however, that Landlord in no event shall be required to expend for such repair of the Premises or the building of which the Premises are a part an amount in excess of the insurance proceeds received by Landlord as a result of such damage.  If all or a portion of the Premises is damaged or destroyed from by fire, explosion, or other casualty and Landlord reasonably determines that such damage cannot, in the ordinary course, commercially reasonably be expected to be repaired within two hundred seventy (270) days from the date of such casualty (after accounting for all applicable factors, including time for claims adjustment and permitting), then Tenant may terminate this Lease upon delivery of written notice to Landlord of such election, provided that such notice is delivered to Landlord within thirty (30) days after the date of such determination by Landlord.  If the casualty or the repairing or rebuilding shall render the Premises untenantable in whole or in part, a proportionate abatement of the Minimum Rent and Operating Charges shall be abated from the date when the damage occurred until the earlier of Tenant's reopening for business or until thirty (30) days after Landlord delivers the Premises to Tenant, or until the effective date of termination as herein provided, such abatement to be computed on the basis of the relation which the square-foot area of the space rendered untenantable bears to the aggregate square foot area of the Premises.  If Landlord is required or elects to rebuild the Premises as herein provided, Tenant shall at its sole expense, repair or replace its betterments and improvements, stock in trade, fixtures, furnishings, floor coverings, equipment, and all other items which Tenant will require in order to operate in the Premises or is required to insure hereunder, and if Tenant has closed, Tenant shall promptly reopen for business.

16.2     Eminent Domain  If the whole or any part of the Premises shall be taken under the power of eminent domain, whether by condemnation or friendly acquisition, this Lease shall terminate as to the part so taken on the date Tenant is required to yield possession thereof to the condemning or acquiring authority.  In the event of a partial taking which does not render the balance of the Premises unusable by Tenant, Landlord shall within sixty (60) days of such taking make such repairs and alterations to the Premises as may be necessary in order to restore the part not taken (not including Tenant's betterments or improvements) to useful condition, and the Minimum Rent and other charges shall be reduced in proportion to the portion of the Premises so taken.  Minimum Rent and the Operating Charges shall be abated during the portion of any of the restoration period in which the Premises are unfit for occupancy or for the usual conduct of Tenant's business.  In the event Tenant's use of the Premises is materially impaired due to such taking, either party may terminate this Lease as of the date on which Tenant is required to yield possession by giving written notice to the other party not less than twenty (20) days following notice of any such condemnation or friendly acquisition.  Tenant shall have no right to any award or compensation in connection with any exercise of the power of eminent domain; provided, however, nothing contained herein shall prevent Tenant from claiming, proving, and receiving awards for moving expenses or removal of trade fixtures so long as such award does not diminish the amount of any award to Landlord or Landlord's mortgagee.

EXHIBIT ___A___
PAGE _24_ OF _52_

Exhibit 1 - Page 36

16.3    Tenant Indemnity   Tenant hereby agrees to indemnify, protect, defend and hold Landlord, its agents and employees, harmless from and against any and all claims, actions, damages, liabilities and expenses resulting from or connected  (i) to the presence of Hazardous Materials in the Retail Center due to an act or omission of Tenant, its officers, agents, contractors, employees, licensees or invitees or (ii) with any loss of life, personal injury and/or damage to personal or real property, arising from or out of the occupancy or use by Tenant of the Premises or any part thereof or occasioned wholly or in part by any act or omission of Tenant, its officers, agents, contractors, employees, licensees and invitees in the Retail Center; provided, however, that the foregoing indemnity shall not apply to any claims, actions, damages, liabilities or expenses directly resulting from the gross negligence or willful misconduct of Landlord or Landlord's officers, employees or agents or a breach by Landlord of its obligations hereunder. Tenant further releases Landlord, its agents and employees, from liability for any damages sustained by Tenant or any other person claiming by, through or under Tenant due to the Premises, the Retail Center, or any part thereof or any appurtenances thereto becoming out of repair, or due to the happening of any accident (except to the extent that such accident is directly caused by the gross negligence or willful misconduct of Landlord or Landlord's officers, employees or agents or by a breach by Landlord of its obligations hereunder), including, but not limited to, any damage caused by water, snow, windstorm, tornado, gas, steam, electrical wiring, sprinkler system, plumbing, heating and air conditioning apparatus and from any acts or omissions of co-tenants or other occupants of the Retail Center.

ARTICLE XVII
DEFAULT AND REMEDIES

17.1    Default of Tenant   Tenant shall be in default of this Lease if Tenant

17.1.1    fails to pay all or any portion of any sum due from Tenant hereunder for Rent as and when such sum is due and payable or reimbursement for sums advanced by Landlord on Tenant's behalf hereunder within five (5) days following written notice that such reimbursement is due and payable;

17.1.2    commits waste to the Premises or removes any improvements or betterments thereof;

17.1.3    Intentionally Omitted;

17.1.4    fails to timely deliver to Landlord any estoppel certificate, subordination or attornment agreement as required by Article XIV, or commits an act in violation of the Lease which Landlord has previously notified Tenant to cease more than once in that Lease Year;

17.1.5    becomes bankrupt or insolvent or files any debtor proceeding or if Tenant shall take or have taken against Tenant any petition of bankruptcy, or if Tenant shall take action or have action taken against Tenant for the appointment of a receiver for all or a portion of Tenant's assets, or if Tenant shall file a petition for a corporate reorganization, or shall make an assignment for the benefit of creditors, or if in any other manner Tenant's interest hereunder shall pass to another by operation of law, and with respect to any such action taken against Tenant such action is not dismissed within sixty (60) days (it being understood that any or all of such occurrences shall be deemed a default on account of bankruptcy for the purposes hereof); or

17.1.6    is otherwise in default hereunder and shall not have cured such default within twenty (20) days following written notice from Landlord or such longer period as may be reasonably necessary if such default is of such a nature that it cannot being cured within twenty (20) days, provided that Tenant promptly commence and diligently and continuously pursue completion of such cure.

17.2    Remedies of Landlord   On the occurrence of a default of this Lease by Tenant, Landlord may, at any time thereafter with or without notice or demand and without limiting Landlord in the exercise of any right or remedy which Landlord may have

17.2.1    Terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord, and if Tenant fails so to do, Landlord may, without prejudice to any other remedy which Landlord may have for possession or arrearages in rent, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying such Premises or any part of the Premises, by self-help means, at Landlord's

EXHIBIT   A
PAGE  25  OF  52

Exhibit 1 - Page 37

option, without being liable for prosecution or any claim of damages therefor, and Tenant agrees to pay to Landlord on demand the amount of all loss and damage which Landlord may suffer by reason of such termination, whether through inability to relet the Premises on satisfactory terms or otherwise.  Landlord's right to any and all damages and remedies shall survive termination of this Lease.

17.2.2    Enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying the Premises or any part of the Premises, by self-help means, at Landlord's option, without being liable for prosecution or any claim for damages, and relet the Premises for such terms ending before, on or after the expiration date of the Term, at such rentals and upon such other conditions (including concessions and prior occupancy periods) as Landlord in its sole discretion may determine, and receive the rent for such reletting; and Tenant agrees to pay to Landlord on demand any deficiency that may arise by reason of such reletting together with all costs incurred by Landlord in connection with such reletting.  Landlord shall have no obligation to relet the Premises in advance of any other available space owned by Landlord and shall not be liable for refusal or failure to relet or in the event of reletting for refusal or failure to collect any rent due upon such reletting; provided, however, that Landlord shall use commercially reasonable efforts to mitigate damages.  In the event Landlord is successful in reletting the Premises at a rental in excess of that agreed to be paid by Tenant pursuant to the terms of this Lease, Landlord and Tenant each mutually agree that Tenant shall not be entitled, under any circumstances, to such excess rental, and Tenant does hereby specifically waive any claim to such excess rental.

17.2.3    Landlord shall have the right to recover unpaid rent and all damages caused by Tenant's default, including, without limitation, attorneys' fees.  Damages shall include, without limitation all accrued and unpaid rent; damages attributable to Rent lost during any period during which the Premises are not relet if Landlord uses commercially reasonable efforts to relet the Premises, the difference between the Rent reserved under this Lease for the remainder of the Term and the reasonable rental value of the Premises for such period as determined pursuant to Oregon law; all legal expenses and other related costs incurred by Landlord following Tenant's default; all costs incurred by Landlord in restoring the Premises to good order and condition, or in remodeling, renovating or otherwise preparing the Premises for reletting; all costs, including without limitation any brokerage commissions; plus interest on all such expenditures at the Interest Rate per annum from the date of expenditure until fully repaid.  The "Interest Rate" shall equal the rate on 10-year U.S. Treasury Bonds plus eight hundred (800) basis points.

17.2.4    Landlord may sue periodically to recover damages during the period corresponding to the remainder of the Term, and no action for damages shall bar a later action for damages subsequently accruing.

17.2.5    Pursuit of any of the foregoing remedies shall not constitute a forfeiture or waiver of any rent due to Landlord under this Lease or of any damages accruing to Landlord by reason of the violation of any of the terms, provisions, conditions, and covenants contained in this Lease.  No act or thing done by Landlord or its agents shall be deemed a termination of this Lease or an acceptance of the surrender of the Premises, and no agreement to terminate this Lease or accept a surrender of the Premises shall be valid unless in writing signed by Landlord.

17.3    Intentionally Omitted  Late Charges  If Tenant shall fail to make any payment of rentals, costs, additional rentals or other charges when due as herein provided, then such sums shall bear interest at the highest legal rate not to exceed twelve percent (12%) per annum calculated from said due date.  In addition, Tenant shall pay on demand a late charge equal to five percent (5%) of the delinquent payment for processing of late payments as Additional Rent.

17.5    Remedies Cumulative  All rights and remedies of Landlord herein created or remedies otherwise available (at law or in equity) to Landlord under the laws of the United States or Oregon, which Landlord may, at its option, invoke, are cumulative and the exercise of one or more rights or remedies shall not be taken to exclude or waive the right to the exercise of any other.  All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Landlord shall deem desirable.

ARTICLE XVIII
SURRENDER OF PREMISES

Tenant, upon expiration or termination of this Lease, either by lapse of time or otherwise, agrees peaceably to surrender to Landlord the Premises, including the alterations, additions, improvements, changes, and fixtures other

Exhibit 1 - Page 38

than Tenant's movable trade fixtures, in broom-clean condition and in good repair, ordinary use and wear excepted; provided, however, that Tenant shall be required to remove such alterations as Landlord requires pursuant to Section 8.1 hereof. Tenant agrees to remove Tenant's sign and/or trade fixtures upon such expiration or termination and to repair all damages to the Premises caused by or resulting from such removal. Tenant's failure to remove all or part of Tenant's sign and/or trade fixtures upon such expiration or termination shall be deemed an abandonment to Landlord of such sign and/or trade fixtures and, if Landlord elects to remove all or any part of said sign and/or trade fixtures, such removal, including the cost of repairing any damage to the Premises caused by or resulting from such removal, shall be paid by Tenant. If Tenant fails to surrender the Premises as provided above, Tenant agrees to pay Landlord, as liquidated damages, a sum equal to 150% of the Rent to be paid by Tenant to the Landlord for all the time Tenant shall so retain possession of the Premises or any part thereof; provided, however, that Tenant shall be deemed to be a "Tenant at Sufferance" and the exercise of Landlord's rights under this clause shall not be interpreted as a grant of permission to Tenant to continue in possession.

ARTICLE XIX
ACCESS TO PREMISES

Tenant agrees that Landlord, its agents, employees, or servants or any person authorized by Landlord may, at Landlord's sole discretion, enter the Premises to inspect the condition of the same, to make such repairs, additions, improvements, changes, or alterations to the Premises, the building of which they are a part or the Retail Center as Landlord may elect to make and to exhibit the same to prospective purchasers of the Retail Center, or to prospective tenants, without any such activity constituting an eviction of Tenant in whole or in part, and the rent reserved shall in no way abate by reason of loss or interruption of the business of Tenant or otherwise while any such work is being done. If Tenant or Tenant's agents or employees shall not be present or permit entry into the Premises when necessary or permissible under this Lease, Landlord, or Landlord's agent or employees may enter same by whatever lawful means necessary without liability therefor and without in any manner affecting the obligations, covenants, terms, or conditions of this Lease.

Notwithstanding the foregoing or any other provision herein, any entry into the Premises by Landlord during the Term shall be subject to the following terms and conditions: (a) Landlord shall give at least twenty-four (24) hours prior notice of any entry (except in the case of emergency, in which case no prior written or oral notice need be given); (b) any such persons entering into the Premises shall at all times use commercially reasonable efforts to avoid materially interfering with Tenant's business operations within the Premises; (c) to the extent commercially reasonably possible, non-emergency repairs will be scheduled to occur during non-business hours; (d) to the extent commercially reasonably possible , Landlord will cause any entry with prospective tenants, purchasers, lenders or other similar parties to be made during normal business hours when a representative of Tenant is present; and (e) upon its completion of any alteration, improvement, maintenance, repair or other work within the Premises, Landlord shall promptly restore the Premises to substantially the same condition which existed prior to such entry.

ARTICLE XX
MISCELLANEOUS

20.1    Notices  Notices and demands required or permitted to be given hereunder may be given by personal delivery to either party or any officer or other representative of the party to be notified, or may be sent by recognized overnight courier or certified mail, return receipt requested, addressed, postage prepaid, to the address set forth in Sections 1.1.3 and 1.1.6 hereof. Notices and demands shall be deemed to have been given upon the date of delivery provided that if any party shall refuse delivery, notices shall be deemed given when mailed or, if made by personal delivery or overnight courier, then upon the delivery except that notice of change of address for notices shall not be deemed made until received. Unless otherwise specified by Landlord, the payment of Rent shall be to the address of Landlord as set forth in Section 1.1.4 hereof.

20.2    Successors and Assigns  Subject to Article XV, all covenants, promises, conditions, representations, and agreements herein contained shall be binding upon, apply, and inure to the parties hereto and their respective heirs, executors, administrators, successors, and permitted assigns.

EXHIBIT __A__

PAGE __27__ OF __52__

Exhibit 1 - Page 39

20.3    Representations and Entire Agreement  It is further understood and agreed by Tenant that Landlord and Landlord's agents have made no written or oral representations or promises with respect to the Premises or the making or entry into this Lease (including with respect to the identity or existence of any other tenants or proposed tenants in the Retail Center or the redevelopment of the Retail Center) except as expressly set forth in this Lease and that no claim or liability, or cause for termination, shall be asserted by Tenant against Landlord for, and Landlord shall not be liable by reason or breach of any representations or promises not expressly stated in this Lease.  This Lease and the Exhibits attached hereto constitute the sole and exclusive agreement between the parties with respect to the Premises.  No amendments, modifications of or supplements of this Lease shall be effective unless in writing and executed by Landlord and Tenant.

20.4    Time is of the Essence  The time of the performance of all of the covenants, conditions, and agreements of this Lease is of the essence of this Agreement.

20.5    Recording  This Lease shall not be recorded, but, promptly following the request of Tenant, Landlord and Tenant shall execute a short form memorandum of lease for recording in the official records of Washington County (Oregon).  Tenant agrees that, following the expiration or earlier termination of this Lease, it will promptly execute upon the request of the Landlord a termination of the memorandum of lease for recording in the official records.

20.6    Relationship of Parties  Nothing herein shall be construed so as to constitute a joint venture or partnership between Landlord and Tenant.

20.7    Waiver  One or more waivers of any covenant or condition by Landlord shall not be construed as a waiver of a subsequent breach of the same or any other covenant or condition, and the consent or approval by Landlord to or of any act by Tenant requiring Landlord's consent or approval shall not be construed to waive or render unnecessary Landlord's consent or approval to or of any subsequent similar act by Tenant.

20.8    Litigation  Landlord and Tenant do hereby waive trial by jury in any action, proceeding, or counterclaim brought by either against the other upon any matters whatsoever arising out of or in any way connected with this Lease, Tenant's use or occupancy of the Premises, and/or any claim of injury or damage.

20.9    Force Majeure  In the event that either party shall be delayed or hindered in, or prevented from, the performance of any work, service, or other act required under this Lease to be performed by the party and such delay or hindrance is due to strikes, lockouts, acts of God, governmental restrictions, enemy act, civil commotion, unavoidable fire or other casualty, or other causes of a like nature beyond the control of the party so delayed or hindered, then performance of such work, service, or other act shall be excused for the period of such delay and the period for the performance of such work, service, or other act shall be extended for a period equivalent to the period of such delay.  In no event shall such delay constitute a termination or extension of this Lease.  The provisions of this Paragraph shall not operate to excuse Tenant from the prompt payment of Rent as due under any provision hereof.

20.10    Governing Law  This Lease shall be construed under the laws of the State of Oregon.

20.11    Partial Invalidity  If any provision of this Lease or the application thereof to any person or circumstance shall to any extent be held invalid, then the remainder of this Lease or the application of such provision to persons or circumstances other than those as to which it is held invalid shall not be affected thereby, and each provision of this Lease shall be valid and enforced to the fullest extent permitted by law.

20.12    Submission of Lease  The submission of this Lease for examination does not constitute an offer to lease, or a reservation of or option for the Premises, and this Lease shall be effective only upon execution and delivery thereof by Landlord and Tenant.

20.13    Interpretation  In interpreting this Lease in its entirety, the printed provisions of this Lease and any additions written or typed thereon shall be given equal weight, and there shall be no inference, by operation of law or otherwise, that any provision of this Lease shall be construed against either party hereto.

EXHIBIT____A____

PAGE_28_OF_52_

Exhibit 1 - Page 40

20.14    Brokerage Commissions  Tenant hereby warrants and represents to Landlord that there are no real estate commissions due any broker, agent or other party in connection with the negotiation or execution of this Lease acting for or on behalf of Tenant other than those specified in Section 1.1.20 and Tenant hereby agrees to indemnify, protect, defend and hold Landlord harmless from and against any and all costs, expenses, liabilities, causes of action, claims or suits in connection with compensation, commissions, fees or other sums claimed to be due and owing to anyone claiming through Tenant other than the person or entity specified in Section 1.1.20.

20.15    Limitation of Liability  Landlord's liability to Tenant for damages or otherwise with respect to the Lease shall be limited solely to, and recovered, if at all, solely from Landlord's interest in the Retail Center.  No personal judgment shall be against Landlord upon extinguishment of its rights in the Retail Center and any judgment so rendered shall not give rise to any right of execution or levy against Landlord's assets.  In no event shall Landlord ever be liable under this Lease for any consequential damages, punitive damages, special damages or any similar type of damages.

20.16    Survival of Obligations  The provisions of this Lease with respect to any indemnity obligation or any obligation of Tenant to pay any sum in order to perform any act required by this Lease after the expiration or other termination of this Lease shall survive the expiration or other termination of this Lease.

20.17    Headings, Captions and References  The section captions contained in this Lease are for convenience only and do not in any way limit or amplify any term or provision hereof.  The use of the terms "hereof," "hereunder" and "herein" shall refer to this Lease as a whole, inclusive of the Exhibits, except when noted otherwise.  The use of the masculine or neuter genders herein shall include the masculine, feminine and neuter genders and the singular form shall include the plural when the context so requires.

20.18    Accord and Satisfaction  No payment by Tenant or receipt by Landlord of a lesser amount than any payment of rent or additional rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent or additional rent then due and payable.  Accordingly, Tenant agrees that Landlord shall not be bound by any endorsement or statement on any check or any letter accompanying any check or payment and no such endorsement, statement or letter shall be deemed an accord and satisfaction, and Landlord or Landlord's bank may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy provided in this Lease, at law or in equity.

20.19    Performance of Tenant's Covenants  Tenant covenants and agrees that it will perform all agreements and observe all covenants herein expressed on its part to be performed and observed and that it will promptly, upon receipt of written notice specifying action required by this Lease (a "Compliance Notice"), comply with such notice, and further, that if Tenant shall not comply with any such notice to the satisfaction of Landlord prior to the date on which such non-compliance would constitute a default under this Lease, in addition to, and not in lieu of or in limitation of any other remedy which Landlord may have pursuant to this Lease, at law or in equity, Landlord may, but shall not be obligated to, enter upon the Premises and do the things specified in such notice; provided, however, that Landlord agrees not to exercise the aforementioned entry and self-help right until Tenant has failed to comply (to the satisfaction of Landlord prior to the date on which such non-compliance would constitute a default under this Lease) with at least two (2) other Compliance Notices from Landlord.  Landlord shall have no liability to Tenant for any loss or damage resulting in any way from such action and Tenant agrees to pay upon demand, as additional rent, any sums or costs incurred by Landlord in taking such action, plus administrative costs of Landlord in an amount equal to twenty percent (20%) of such sums and/or costs.  Notwithstanding the foregoing, Landlord's performance of any or all of Tenant's covenants shall not release Tenant from liability for non-performance.

20.20    Entire Agreement  Except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and executed by both parties.

20.21    Landlord Subordination Agreement

Landlord and Tenant agree to execute and deliver to each other the "Landlord Subordination" agreement attached hereto simultaneously with the execution of this Lease.  Tenant shall deliver to Landlord a fully-executed original of the Landlord Subordination agreement within thirty (30) days of the date of full execution of this Lease.

EXHIBIT _____A_____

PAGE _29_ OF _52_

Exhibit 1 - Page 41

IN WITNESS WHEREOF this Lease has been executed as of the day and year first above written.

LANDLORD                           ATLAS GREENWAY LLC, an Oregon limited liability company

                                   By: _____
                                       Katherine Durant, President


TENANT                             PHARMACA INTEGRATIVE PHARMACY, INC., a Delaware
                                   corporation

                                   By    _____
                                   Title _____

{00214507;7}                                26                          EXHIBIT____A____

                                                                        PAGE 20 OF 52

Exhibit 1 - Page 42

EXHIBIT "A"

<u>SITE PLAN</u>



EXHIBIT  A

PAGE 31 OF 52

Exhibit 1 - Page 43

EXHIBIT "A-1"

<u>OUTLINE OF PREMISES</u>



{00214507;7}

1

EXHIBIT ___A___

PAGE __32__ OF __52__

Exhibit 1 - Page 44

EXHIBIT "B"

<u>Intentionally Omitted</u>

{00214507;7}

1

EXHIBIT____A____

PAGE__33__OF__52__

Exhibit 1 - Page 45

EXHIBIT "C-1"

LANDLORD'S WORK

Landlord shall deliver possession of the Premises to Tenant in its "as is" condition and shall not be obligated to perform any work or provide any facilities in relation to the Premises or the Retail Center, except as specifically set forth as follows:

1. Landlord shall remove the prior tenant's finishes, furniture, restaurant equipment or other materials, including without limitation, floor tile, ceiling tile/grid, equipment and wall removal, and other related work.

2. Floor covering shall be exposed concrete in broom clean condition with any obstructions removed.

3. All Building perimeter exterior walls and façade remodel shall be constructed to the minimum standard required by fire code and local energy code requirements including exterior finish, vapor barrier, insulation, studs or furring and sheetrock fire taped and sanded, texture ready. Facade remodel shall be completed before Landlord delivery.

4. Wall insulation shall extend above storefronts to the roof structure or, as the case may be, to the underside of floor structure in the case of a multi-story building condition.

5. All demising partitions (complete party wall(s) dividing the Premises from that of adjacent lease space, extending from floor slab up to roof deck, or as the case may be, to the underside of floor structure in the case of a multi-story building condition), shall be constructed to the minimum standards required for the appropriate fire rating dictated by the governing code or authority including insulation and fire taped, sanded, texture ready sheetrock.

6. New roofing shall be built up with a minimum 25-year life warranty.

7. Roof shall be insulated with minimum R-19 or greater roof insulation as required by local energy code (Title 24 in CA).

8. Landlord shall install roof platforms for heating, ventilation and air conditioning equipment, and roof penetrations for ducts, vents, plumbing and conduits.

9. The ceiling in the Premises shall be open structure with thermal insulation as necessary to conform to the minimum standard required by local Energy Code (Title 24 in CA).

10. Roof mounted HVAC package units shall be installed on factory curbs including all utility connections for an operational HVAC system.

11. HVAC units shall be sized and zoned to accommodate approximately one ton of AC per 300 sq. ft. and shall meet or exceed efficiency requirements of Title 24 energy efficiency standards. There must be a minimum of three (3) units to be sized and located per tenant requirements for proper zoning.

12. The HVAC units shall have a minimum SEER rating of 13.

13. Landlord's HVAC installation shall include power connections, control wiring, and condensate lines. Supply and return plenums shall be stubbed through the roof (or, as the case may be, to the underside of floor structure in the case of a multi-story building condition) into the Premises.

14. Landlord to demo the existing restrooms and cap utilities.

15. Landlord to install new 400 amp (or two 200 amp) 120/208 volt 3 phase 4 wire service distribution panels with separate meter and switch for each tenant space as may be determined by the requirements of the local

(00214507;7)                                      1

EXHIBIT  A
PAGE  34  OF  52

Exhibit 1 - Page 46

authorities. Service entrance shall be in a common electrical room along with telephone company backboard. Panel shall be brought to Tenant's Premises.

16. Landlord shall install a J-box above storefront(s) of the Premises for Tenant's exterior sign with conduit stubbed to the interior of the Premises (as part of façade remodel).

17. Landlord shall install a main telephone terminal board at location outside the Premises for Tenant's connection to telephone service.

18. All utilities will be brought up to the Premises line.

19. Landlord shall install a water sub-meter - Landlord will provide water service for Tenant through use of sub-meter. Separate city meter is preferred but if not allowable, the Landlord will sub-meter and bill tenant on a monthly basis.

20. Water pressure at pipe stub shall be between 35 psi and 60 psi.

21. Landlord is responsible for snaking out all existing sewer lines to the main connection and to clear them of any grease or residue from the previous restaurant tenant and certify that they are in good condition.

22. An automatic fire sprinkler system, if required by code, shall be installed by local authorities to cover the building shell with main riser, tamper switch, main and distribution piping, up and down heads based on light hazard use and a maximum of 130 sq. ft per head, conforming to local code requirements.

23. Landlord shall install a complete fire alarm system, including duct smoke detectors to be located in rooftop HVAC units as and to the extent required by code.

24. Landlord shall install an address sign.

25. Exterior lighting (parking lots, entrances, paths of travel) must have a minimum average rating of 10-foot candles.

26. All exterior finishes (paint, tile, awnings, etc.) shall be upgraded and/or replaced to appear in like-new condition.

27. Trash and recycle enclosure within 100 feet of the Premises.

28. Premises shall be delivered with all parking and hardscape completed and in accordance with ADA requirements and lease requirements.

29. All exterior hardscape improvements must meet ADA compliance; including all exterior ramps, railings and paths of travel.

30. All means of egress and areas of refuge shall meet fire code and ADA compliance.

Construction Allowance:

In addition, as an inducement to lease, Landlord shall provide Tenant with a "Construction Allowance" for leasehold improvements equal to $135,000. The Construction Allowance shall be paid within thirty (30) days after Tenant's compliance with: (i) all of the requirements set forth in Section 12 of the Tenant's Work exhibit attached as Exhibit "C-2" to the Lease, (ii) Tenant shall not be in arrears with regard to any Rent or other charges which may be due or owing, (iii) Tenant is open for business in the Premises, and (iv) Tenant shall have delivered to Landlord 1 hard copy and 1 digital copy of as-built drawings of all of the Tenant's Work that was constructed in the Premises."

No amount of the Construction Allowance shall be allowed to purchase Tenant's inventory or as a set-off against Rent or any other charges owing to Landlord by Tenant. In the event Tenant is in default under the Lease beyond

{00214507;7}                                   2                        EXHIBIT___A_____

PAGE __35_ OF _52_

Exhibit 1 - Page 47

any applicable grace period and Landlord thereafter terminates this Lease, the unamortized portion of the Construction Allowance shall be deemed sums advanced by Landlord on Tenant's behalf and such unamortized portion (in accordance with the formula set forth below) shall be due from Tenant as Additional Rent payable in a lump sum as an additional remedy of Landlord under Article XVII of the Lease.

**Amortization Formula**

$U = A \times (RM \div LM)$

WHERE

$U$ = Unamortized portion of Construction Allowance.

$A$ = Amount of Construction Allowance plus simple interest at 12% per annum from the date of this Lease until the date of termination.

$LM$ = Total Months during the initial Lease Term.

AND

$RM$ = Remaining Months to the end of the initial Lease Term.

{00214507;7}                                        3

EXHIBIT ___A___
PAGE _36_ OF _52_

Exhibit 1 - Page 48

EXHIBIT "C-2"

TENANT'S WORK

1.    Design of Tenant's Work

1.1    Within fifteen (15) days after execution of the Lease, Tenant shall notify Landlord of the identity and mailing address of the licensed architect engaged by Tenant for the preparation of the store design drawings, plans and specifications for the Tenant Work, any changes in Landlord's Work and the approximate split in the tenant space between sales area and storage area.

1.2    Within a reasonable time following execution of the Lease, Landlord will provide Tenant with an outline drawing and design criteria containing basic information pertinent to the project and the Premises as outlined in Exhibit "C-1" and this Exhibit "C-2". Within thirty (30) days after receipt from Landlord of the outline drawing and design criteria, Tenant shall submit to Landlord for Landlord's approval, a preliminary plan showing the desired design character and finish of the Premises (the "Store Design Drawings"). The Store Design Drawings shall comply with the outline drawing and design criteria from Landlord, the terms of the Lease and shall set forth in general the alteration and renovation desires of Tenant including, without limitation, the architectural design of the space, plans, elevations, sections, material selections and finishes.

1.3    As soon as reasonably practicable after receipt of the Store Design Drawings, Landlord shall return to Tenant a set of prints of Store Design Drawings with its suggested modifications and/or approval, which approval shall not be unreasonably withheld or delayed. If Tenant disagrees with Landlord's comments, Tenant may do so in writing within fifteen (15) days of receipt of Landlord's comments. Unless Tenant responds within such fifteen (15) day period, Tenant shall be deemed to have accepted all suggested modifications.

1.4    If the Store Design Drawings are returned to Tenant with comments, the Store Design Drawings shall be revised by Tenant and resubmitted to Landlord within fifteen (15) days of receipt by Tenant.

1.5    Promptly following the date on which the Store Design Drawings bearing Landlord's approval (with or without suggested modifications) are returned to Tenant, Tenant, at its sole cost and expense, shall cause its architect or designer to prepare working drawings and specifications (the "Plans") for the Premises based on the Store Design Drawings approved by Landlord.

1.6    Upon completion of the Plans, Tenant's architect or designer shall submit to Landlord one (1) set of Plans for Landlord's approval. Landlord's approval of the Plans shall not be unreasonably withheld; provided, however, Landlord may withhold its approval in its sole discretion with respect to those improvements which affect or relate to mechanical or electrical systems, structural integrity and/or storefront design. One (1) set of Plans bearing Landlord's comments, if any, shall be returned to Tenant's architect or designer within ten (10) business days after receipt thereof.

1.7    The Plans shall be prepared in compliance with the Landlord's outline drawing and design criteria and requirements set forth in the Lease and shall adhere to the Store Design Drawings approved by Landlord. The Plans shall include, without limitation, the following

1.7.1    Key plan showing location of the Premises.

1.7.2    Floor plan using at least 1/8" scale.

1.7.3    Overall section at 1/4" scale.

1.7.4    Reflected ceiling plan at 1/8" scale.

1.7.5    Plan, elevation and section of storefront at 1/4" scale.

1.7.6    Interior elevations at 1/4" scale.

{00214507;7}                                          1

EXHIBIT    A
PAGE  37  OF  52

Exhibit 1 - Page 49

1.7.7    Full section of types of partitions used at 1/2" scale.

1.7.8    Details of special conditions encountered at 1/2" scale.

1.7.9    Details of proposed changes to the storefront at 1/2" scale.

1.7.10    Door schedule with jamb details at 1-1/2" scale.

1.7.11    Finish schedule and sample boards of finishes.

1.7.12    Sprinkler, plumbing, heating, ventilating and cooling plans at 1/8" scale.

1.7.13    Mechanical details at 1" scale.

1.7.14    Electrical plans at 1/8" scale.

1.7.15    Electrical details and fixture schedules.

1.7.16    Specifications covering all Tenant's Work, architectural (including list of hardware), electrical, plumbing, heating, ventilating and air conditioning.

1.7.17    Trade fixtures and security vaults.

1.7.18    All requirements of licensing, health and other similar authorities having jurisdiction over the Premises.

The Plans shall be submitted to Landlord in the form of reproducible prints within thirty (30) days of receipt by Tenant from Landlord of approved Store Design Drawings.

1.8    Landlord shall review the Plans and shall notify Tenant, within fifteen (15) days of receipt of the Plans, of the matters, if any, in which the Plans do not conform to the approved Store Design Drawings or otherwise do not meet with Landlord's approval. Tenant shall, within ten (10) days of receipt of Landlord's response, cause the Plans to be revised as required to obtain Landlord's approval and shall resubmit the Plans for Landlord's approval within such ten (10) day period. When Landlord has approved the Plans, Landlord shall initial and return one (1) set of approved Plans to Tenant, which set shall also show the date of Landlord's approval. Tenant shall not commence the Tenant's Work until Landlord has approved the Plans.

2.    Construction of Tenant Work. The following shall be part of Tenant's Work.

2.1    Natural Gas. Natural gas meter, gas service from meter location to Tenant's Premises, all gas distribution and final connections. Gas company charges for bringing gas service to meter locations shall be paid for by Landlord.

2.2    Payment of Utilities. Tenant has sole obligation for payment of all individually metered, and special use utility company use fees and connection charges. Tenant shall pay to Landlord its pro rata share of fees and charges for utility services shared with other users.

2.3    Telephone. All switching, wiring and distribution of telephone service from Landlord's main telephone backboard.

2.4    Walls. All interior partitions and curtain wall within the Premises.

2.5    Floors. All floor coverings and bases.

2.6    Interior Finishes. All interior painting and finishes including finishes on demising walls, ceilings, and floors.

2.7    Furniture & Fixtures. All store fixtures, cases, displays windows, cornices, etc.

{00214507;7}                                  2

EXHIBIT ___A___

PAGE _38_ OF _52_

Exhibit 1 - Page 50

2.8     Alarm Systems. All fire monitoring, intrusion alarm systems and protective devices. Any exterior systems to be approved by Landlord in writing.

2.9     HVAC. All special HVAC equipment beyond Landlord provided HVAC equipment ("Vanilla" Shell Option).

2.10    Insulation of Tenant's Appliances. Tenant shall insulate Tenant's appliances so that excessive heat is confined to within the Premises.

2.11    Security Equipment. Any security grills or closures. The equipment must be located behind storefront and subject to Landlord's writing approval.

2.12    Special Equipment and Construction. All special equipment and construction such as stairs, conveyors, elevators, escalators, dumbwaiters, roll-up doors, etc. including installations and electrical connections.

2.13    Painting or Staining. All interior painting and staining.

2.14    Roof Equipment. Tenant shall not make any roof penetration and/or modifications to accommodate Tenant-provided roof-mounted equipment without Landlord's prior written consent. Any roof-mounted equipment shall be located so as to be fully concealed. Final flashing and patching of any roof penetrations shall be made by Landlord's roofing contractor at Tenant's sole cost and expense. Tenant shall deliver a minimum five (5) year warranty to Landlord for labor and material for all roof modifications.

2.15    Union Labor Provision. Tenant agrees to comply with any union labor provisions as may be required by Landlord, and Tenant agrees to do nothing to cause picketing of the construction site or Project by any labor unions.

2.16    Health Requirements. Tenant shall be responsible for obtaining all approvals from local health department, when required.

2.17    Structural Changes. Any alterations and/or additions and reinforcements to Landlord's structure required to accommodate Tenant's Work shall be Tenant's responsibility and shall be subject to Landlord's prior written approval.

2.18    Hazardous Materials. Tenant shall not introduce or cause to be introduced any asbestos or other toxic or hazardous materials or substances in any construction materials, fixtures or equipment used in the Premises. The use of floor finishes containing asbestos is expressly prohibited.

2.19    Plumbing. Any plumbing beyond the Landlord-provided toilet room including floor drains or sinks. If Tenant engages in grease-producing cooking operations, Tenant shall provide, install and maintain a grease interceptor within the Premises.

2.20    Fire System Requirements. Any additional fire protection system or individual components required per code (i.e. fire monitoring system, smoke detectors, smoke evacuation system, special fire sprinkler modifications to accommodate Tenant's Work, kitchen fire suppression systems, cooking supply and exhaust equipment, etc.) Tenant shall pay to Landlord its pro rata share of fire monitoring equipment installation and recurring fees if the fire monitoring system is shared with other users.

2.21    Fire Sprinkler Systems. Any additional components or modifications required to the Landlord provided fire sprinkler system to accommodate Tenant's floor plan and fixture layout.

2.22    Construction Plans. Tenant shall obtain Landlord's prior written approval of Tenant's plans and specifications. Upon Landlord's approval of Tenant's plans, Tenant shall submit same to the appropriate governmental agencies for approval. Landlord's approval of such Tenant plans and specifications, however, shall create no responsibility for liability on the part of the Landlord with respect to the completeness, design sufficiency, or compliance of such plans and specification with any applicable laws, rules, ordinances, directions or regulations.

EXHIBIT ___A___

PAGE _39_ OF _52_

Exhibit 1 - Page 51

2.23    Documents Delivered to Landlord.  Upon 45 days after completion of Tenant's Work, Tenant shall deliver to Landlord the following a) copy of its final Certificate of Occupancy; b) one set of reproducible "as-built" drawings; and c) a copy of the building permit for Tenant's Work.

2.24    Construction Quality.  Tenant's Work shall be performed in a good and workmanlike manner in accordance with all applicable law, ordinances and codes.  Tenant shall only use new or approved recycled or renewed materials in the performance of Tenant's Work. Tenant shall properly dispose or recycle Tenant's construction debris separately and independently of Landlords' common area trash containers.

2.25    Staging.  The storage of any construction vehicles, machinery, equipment and supplies shall be in a location approved by Landlord.  Tenant shall use its best efforts to prevent any interference with the operation of the Center and the business of any Tenants, subtenants or licensees of the Center.  Tenant shall comply with reasonable rules and regulations promulgated by Landlord to assure compliance with the foregoing.  Tenant understands that breach of these provisions shall be a default of the Lease.

3.    Permits.  Promptly following Landlord's approval of the Plans, Tenant shall obtain all permits and other governmental approvals required for the Tenant's Work.  Tenant shall commence the Tenant's Work promptly after completion of Landlord's Work by Landlord and after obtaining all such required permits and governmental approvals and shall thereafter diligently proceed with completion of the Tenant's Work in conformance with the Construction Rules attached hereto as Exhibit "C-3."

4.    Changes.  Any changes in the Tenant's Work from the approved Plans shall be subject to Landlord's prior approval, which approval shall not be unreasonably withheld or delayed unless the change concerns mechanical or electrical systems, storefront design or structural integrity, in any of which cases Landlord may withhold approval in its sole discretion.

5.    Commencement of Tenant's Work.  Prior to the commencement of the Tenant's Work, Tenant shall provide Landlord with the following

5.1    Notice to Landlord in writing of Tenant's intent to commence construction activities.

5.2    CADD drawing files of the tenant improvements (Tenant's construction documents).

5.3    Certificate showing evidence of insurance as required for both Tenant and Tenant's contractors.  The certificates shall state that the required coverage will remain in force for the duration of construction.

5.4    Copies of all required building and/or special permits and approvals issued by the appropriate governmental authorities for the Tenant's Work.

5.5    Copy of the executed construction contract(s) for the Tenant's Work or a list of all contractors, subcontractors and materials suppliers who will perform work or supply materials in connection with the Tenant's Work.

5.6    Performance and labor materials bonds in amounts and on such forms as Landlord requires.

6.    Review Charges.  If required by Landlord, Tenant shall upon Tenant's submission of the Store Design Drawings, pay Landlord an amount equal to Five Hundred Dollars ($500.00) for Landlord's reasonable actual costs incurred in connection with the review of the Plans and for the additional administrative costs incurred in the monitoring and coordination of Tenant's Work by the on-site staff.

7.    Signs.  All interior and exterior signs shall be installed by Tenant, at Tenant's expense.  The character, design, size and locations of all signs shall meet Landlord's requirements in Exhibit "D" for the installation, design and size of signs and shall be subject to the approval of Landlord, which approval shall not be unreasonably withheld; and Tenant shall not install any signs until the same have been approved by Landlord, in writing.

{00214507;7}                    4                    EXHIBIT ___A___
                                    PAGE _40_ OF _52_

Exhibit 1 - Page 52

8.    Release of Landlord.  Tenant releases Landlord from any claim whatsoever for damages for any delay in the date on which the Premises shall be ready for delivery to Tenant and this Lease shall not be rendered void or voidable by any such delay.

9.    Insurance and Indemnity.  At all times after delivery possession of the Premises to Tenant, Tenant, Tenant shall maintain in full force and effect, in addition to all other insurance required to be maintained by Tenant under the Lease, maintain public liability insurance coverage of a least $1,000,000.00 for a single occurrence and $2,000,000.00 in the aggregate, builder's risk during construction of Tenant's Work, and casualty insurance with limits of coverage not less than 100% of full replacement cost of Tenant's leasehold improvements.  Tenant shall also maintain Workman's Compensation insurance as required by all applicable federal, state or other laws including employers' liability with a limit of at least $1,000,000.00.  Tenant shall name Landlord with certificates evidencing all insurance coverage at least ten (10) days prior to commencement of Tenant's Work and may not commence construction without having done so.  The insurance shall contain a clause providing that the insurer will not cancel such insurance without giving Landlord ten (10) days prior written notice.  Tenant assumes all risks of damages or injuries, including death, to any property or person used or employed on or in connection with Tenant's Work, and all risks of damages or injuries, including death, to any property or persons wherever located, resulting from any action, omission or operation in connection with Tenant's Work.  Tenant shall indemnify, hold harmless and defend Landlord, it employees, agents, servants, and representatives from and against any and all losses, damages, expenses, claims, suits and demands of whatever nature (including without limitations, reasonable attorney's fees and expenses incurred in the enforcement of this indemnity), resulting from damages or injuries, including death, to any property or person, caused by or arising out of any action, omission or operation in connection with or in any way related to Tenant's Work, except to the extent caused by the negligence or intentional misconduct of Landlord, its agents or employees.

10.    Special Provisions Applicable to Tenant's Work.  Tenant's Work shall be performed in a first-class and workmanlike manner and all improvements constructed pursuant thereto shall be in good and usable condition at the date of completion.  Tenant and Tenant's contractors are limited to performing their work, including any storage for construction purposes, within the Premises only.  Any outside material and/or tool storage must be approved by Landlord in writing.  Tenant shall be responsible for daily removal from the Premises and the Retail Center of all trash, rubbish, and surplus materials resulting from any work being performed in the Premises.  Tenant shall exercise extreme care and diligence in removing such trash, rubbish, or surplus materials from the Premises to avoid littering, marring, or damaging the Retail Center, the Common Area Retail Facilities or any of the other stores located in the Retail Center.  If any such trash, rubbish, or surplus materials are not promptly removed from the Retail Center in accordance with the provisions hereof, or if any of the stores, or Common Area Retail Facilities are littered, marred, or damaged, Landlord may cause same to be removed or repaired, as the case may be, at Tenant's cost and expense.  In the event Landlord incurs any costs or expenses in performing the above, Tenant shall pay the Landlord the amount of any such cost and expenses promptly upon demand therefor.  If requested by Landlord, Tenant shall require its agents, employees, contractors, or subcontractors to cause all materials or supplies to be delivered to the Premises prior to 9:30 a.m. on the day of each such delivery.

11.    Roof.  Tenant shall not penetrate, puncture, or otherwise go upon or work upon any portion of the roof, including, but not limited to that portion of the roof over the Premises, without obtaining the prior written consent of Landlord.  The approval by Landlord of the Plans does not constitute such prior written consent unless otherwise expressly provided in the Plans.  In the event Landlord shall grant its consent to Tenant as provided above, Tenant shall, at Tenant's sole cost and expense, be responsible for assuring that upon completion of the installation of any items upon the roof or of other work thereon that all necessary flashing, patching, and other repair that may, in the sole discretion of Landlord, be necessary to return the roof to a waterproof condition is performed in a first-class and workmanlike manner.

12.    Lien Waivers.  Upon completion of Tenant's Work in accordance with the Plans, Tenant shall give Landlord written notice thereof and shall simultaneously with such written notice furnish Landlord with the following documents all in a form and substance acceptable to Landlord

(a)    A detailed breakdown of the cost of Tenant's Work;

EXHIBIT  A
PAGE  41  OF  52

Exhibit 1 - Page 53

(b)    A certificate of occupancy issued by the appropriate governmental authority indicating that Tenant's construction work was performed in accordance with local and state codes and that the Premises are acceptable for occupancy, which work must be completed in accordance with the Plans approved by Landlord;

(c)    An affidavit from Tenant's general contractor stating that all contractors, subcontractors, materialmen, suppliers, architects, engineers, and all other persons performing work or supplying materials and/or services on or about the Premises in connection with Tenant's Work have been paid in full and have waived all liens and claims arising as a result of such work;

(d)    Approved notarized original lien waivers for all contractors, subcontractors, materialmen, suppliers and all other persons performing work or supplying materials on or about the Premises in connection with Tenant's Work; and

(e)    An estoppel certificate from Tenant.

13.    <u>Structural Work</u>.  Notwithstanding anything to the contrary contained in this Lease, if any work required or proposed to be performed by Tenant shall be structural or shall affect the structural integrity of the Retail Center or any portion thereof, Landlord shall have the right, but not the obligation, to do such work for Tenant and Tenant shall reimburse Landlord for all of Landlord's costs and expenses in connection therewith plus an amount equal to ten percent (10%) thereof for overhead plus an additional amount equal to ten percent (10%) of such total costs and overhead for profit.

14.    <u>Labor Relations</u>.  To the end that there shall be no labor disputes which would interfere with any construction occurring in the Retail Center or the operation thereof, or any part thereof, including, but not limited to, the Premises, in performing any Tenant's Work, Tenant agrees to engage the services of only such contractors and/or subcontractors as will work in harmony and without causing any labor dispute with each other, with Landlord's employees, contractors and subcontractors and with the employees, contractors and subcontractors of all others working in or upon the Retail Center or any part thereof, and Tenant shall require its contractors and subcontractors to employ only such labor as will work in harmony and without causing any labor dispute with each other, with Landlord's employees, contractors and subcontractors and with the employees, contractors, and subcontractors of all others working in or upon the Retail Center or any part thereof.  Furthermore, only those contractors and subcontractors as have been duly licensed by the authority having jurisdiction over the appropriate profession and which have been approved in writing by Landlord may perform any portion of Tenant's Work for Tenant in or upon the Premises.

15.    <u>Coordination of Tenant's Work</u>.  Tenant's Work shall be coordinated with all work being performed or to be performed by Landlord and other occupants of the Retail Center to the end that Tenant's Work will not interfere with the operation of the Retail Center or interfere with or delay the completion of any other construction within the Retail Center.  Tenant shall cause each contractor and subcontractor working on the Premises to comply with all procedures and regulations prescribed by Landlord, including, without limitation, those for payment of a construction security deposit and for integration of Tenant's Work with that to be performed in connection with any construction in the Retail Center and with the operation of the Retail Center.  If the Premises have a back door or other entrance apart from the central public areas of the Retail Center, all contractors performing Tenant's Work shall use such entrance.

16.    <u>Construction Barricades</u>.  It shall be Tenant's responsibility to cause each contractor and subcontractor to maintain continuous protection of adjacent property and improvements against damage by reason of Tenant's Work, including, at Landlord's request, the installation of lights, guard rails, barricades and temporary store fronts of design approved by Landlord, or at Landlord's option, Tenant shall reimburse Landlord, on demand, for the cost incurred by Landlord's installation of such items.  Tenant shall maintain the Premises and the Common Area Retail Facilities adjoining the same in a clean and orderly condition during construction and shall construct a storefront barricade of sheetrock constructed, taped, painted and finished in a manner approved by Landlord.  Notwithstanding any other provisions of the Lease to the contrary, Tenant shall not have the right to remove the barricades installed in, on or around the Premises or to initially open for business within the Premises to the public until such time as  (i) Landlord and Tenant or Tenant's contractor have completed a walk-through inspection of the Premises in order to complete Landlord's standard form "punch list" verifying that all construction has been done in

{00214507;7}                                      6

Exhibit 1 - Page 54

strict accordance with Tenant's final approved plans; and (ii) Landlord has verified to Tenant, in writing, that all "punch list" items have been completed to Landlord's reasonable satisfaction and in accordance with the final approved plans and the terms and provisions of the Lease.  Provided that Tenant delivers to Landlord at least two (2) business days advance written notice that Tenant Work has been completed, Landlord shall deliver such written verification of punchlist items to Tenant's on-site store manager within twenty-four (24) hours after such walk through inspection.  Removal of the barricades by Tenant prior to Tenant complying with all of the above items shall be deemed a default under the Lease and Landlord, at Landlord's sole option, may exercise any and all of its rights and remedies provided Landlord under the Lease.  It shall be Tenant's sole responsibility to contact Landlord in order to schedule such walk-through inspections in order to complete the above requirements.  Tenant shall give Landlord a minimum of forty-eight (48) hours prior notice of Tenant's request for the walk through inspection.

EXHIBIT ___A___

PAGE __43__ OF __52__

Exhibit 1 - Page 55

EXHIBIT "C-3"

<u>CONSTRUCTION RULES</u>

1.      All work to be performed shall be coordinated with the management of the Retail Center or its representative.

2.      Any changes from drawings and specifications shall be made in writing and approved by Landlord before proceeding.

3.      If a deadline is set for completion of work, it shall be completed in that time agreed upon between Tenant and Landlord.  Starting time and completion date of any project shall be put in specifications.

4.      All Tenant construction work shall be confined to the Premises and includes all equipment, tools, materials, and similar items.  At no time shall Tenant unload its equipment, materials, tools, or similar items into any other space without written approval of Landlord.

5.      Common Area Retail Facilities shall not be used by Tenant or by the Tenant's contractors without written approval of Landlord.  After stores in the Retail Center have opened for business, all deliveries shall be scheduled so that materials are stocked in the Premises prior to normal business hours of the Retail Center, and no deliveries of bulk materials shall be made through the Common Area Retail Facilities during business hours.

6.      Loading zones are for loading and unloading purposes only.  No parking shall be permitted in these loading areas and any vehicles parked therein are subject to towing at the Tenant's or vehicle owner's expense.

7.      Nothing is to be stored in the loading zones for any reason, at any time, except vehicles that are loading or unloading.  Others shall be either ticketed and/or towed away at Tenant's expense.  No tools, equipment gang boxes, or similar items shall be allowed in the loading zones.  Anything left in the loading zones shall be removed and labor costs incurred by Landlord charged to the Tenant at a reasonable rate for labor and material charges.

8.      Doors to buildings in the Retail Center shall not be propped open at any time.  Security and maintenance personnel are instructed to remove any door-stops.

9.      All doors shall be made secure at the completion of each work day.

10.     After stores in the Retail Center have opened for business, workers are not permitted to transport tools or materials in wheelbarrows or wheeled vehicles in the Common Area Retail Facilities during normal business hours.

11.     All temporary partitions and dust-proof barriers shall be furnished by Tenant and must remain intact at all times.  Should any panel by removed, torn or otherwise displaced or damaged, it shall be promptly reattached or repaired by Tenant.

12.     All Tenant's space shall be kept clean and free of hazardous conditions.  Compliance with all OSHA Safety Regulations is mandatory.  Tenant must provide evidence that Tenant has an adequate safety and drug testing program in place.

13.     Any debris left by tenant's contractors in the service corridors, adjoining unoccupied tenant spaces, and/or public common areas, may be removed by at the direction of the Landlord and said expense will be at Tenant's cost.

14.     After stores in the Retail Center have opened for business, all dirt or debris caused by contractors outside of the Premises must be cleaned up by thirty (30) minutes prior to commencement of normal business hours.

{00214507;7}                                     1

EXHIBIT  A

PAGE 44 OF 52

Exhibit 1 - Page 56

15.     Tenant shall make arrangements to remove dirt and debris from work after each closing day.  No individual trash or storage containers shall be allowed in the Common Area Retail Facilities without Landlord's permission.  Any containers provided by Landlord to Tenant for construction debris shall be at the Tenant's expense. Where Landlord does not provide containers for removal of debris, Tenant/Contractor shall arrange independently for trash removal service after obtaining Landlord's approval.

16.     All tools, equipment or construction materials left outside of Tenant's space shall become the property of the Landlord.

17.     After stores in the Retail Center have opened for business, all construction activities such as jackhammering and "shot" type mechanical fasteners which create excessive or explosive type noises shall be performed at least thirty (30) minutes prior to or after normal business hours, as established by Landlord.

18.     No one, other than Landlord's approved contractor, shall be on the roof or do any type of work affecting the roof unless so specified in writing from Landlord.  The cost of such work shall be borne by Tenant.

19.     Tenant shall not attach or cause to be attached to any wall or structural member any equipment that may, by virtue of its size or weight, cause structural damage.  Tenant shall not exceed a loading as set forth in the plans and specifications for the floor of the building in which the Premises are located and shall not do anything that might in any way affect the structural integrity of such building.

20.     If appropriate, as determined by the Landlord, Tenant shall provide a mechanical exhaust system, including a make-up air system in all high heat, moisture and odor producing areas.  Cooking exhaust hood shall be Econovent or its equivalent in energy design.

21.     Should Tenant's interior partitioning cause changes or alterations in any fire protection sprinkler system or in the heating and air conditioning system, such changes and alterations shall be made by Landlord's contractors at Tenant's expense.

22.     Except to the extent already provided as part of the Landlord's Work, Tenant shall arrange for installation of electric and water meters at its expense, if necessary.  Any tenant utilizing gas shall be responsible for obtaining a meter approved by the gas company (if necessary), installing same and piping to appliances, except to the extent such work is already provided as part of the Landlord's Work.

23.     All food operations shall install garbage disposals and grease traps as approved by local health department at its expense.

24.     If required by any applicable statute, law, regulation and/or ordinance or if appropriate, as determined by Landlord, a smoke and/or heat detector shall be installed in Tenant's space, at Tenant's expense.  The smoke and/or heat detector shall be connected to the central system if such control system is available by Landlord's contractor at Tenant's expense.

25.     Tenant expenses incurred by Landlord shall be paid immediately upon receipt of invoice from Landlord and shall be delinquent if not paid within five (5) days.  Late charges, interest and collection expenses on delinquent payments shall be charged to Tenant in the manner set forth in the Lease for delinquent payment of rents.

{00214507;7}                                        2                      EXHIBIT __A__

PAGE __45__ OF __52__

Exhibit 1 - Page 57

EXHIBIT "D"

TENANT'S SIGN CRITERIA

This sign criteria has been established for maintaining the overall appearance of the Retail Center. **LANDLORD RESERVES THE RIGHT TO MODIFY THIS SIGN CRITERIA PRIOR TO APPROVING TENANT'S SIGN. THE FOLLOWING REQUIREMENTS ARE TO BE OBSERVED BY ALL TENANTS REGARDING SIGNS. FOR EXAMPLE SEE ATTACHED [NOTE: FOLLOWING COMPLETION OF NEW FAÇADE ON THE BUILDING IN WHICH THE PREMISES IS LOCATED, A REVISED EXAMPLE IMAGE REFLECTING THE THEN-CURRENT SIGN CRITERIA WILL BE ATTACHED.]**

**A. GENERAL - TENANTS' EXTERIOR BUILDING SIGN**
1. All Tenant building signs shall conform to local code ordinances and bear the U.L. label.

2. Sign and electrical permits shall be procured prior to installation.

3. Tenant's sign layout shall be submitted to Landlord for approval before fabrication, indicating colors, exact placement of sign on the building, dimensions of sign and details of construction.

4. An approved drawing is required prior to installation. Signs built without approval or contrary to corrections will be altered to conform to requirements at Tenant's expense.

5. No flashing or animated signs will be permitted.

6. No projections above or below the sign band will be permitted.

7. The Landlord will provide one (1) 20 amp electrical service terminating in a junction box at a point centrally located behind Tenant's sign area.

8. Sign location shall be centered on Tenant storefront sign band and within 80% maximum of Tenant's storefront lineal footage.

9. Signs are to be face lit pan channel letters with LED lighting on exposed raceway. Sign returns to be of prefinished color. Letter size shall not exceed 24" in height. Exposed raceway to be painted to match satin black finish.

10. Tenant logos shall be permitted subject to Landlord's review and approval.

11. One sign per Tenant sign band can be installed.

12. In the event the Tenant vacates the premises, Tenant shall be responsible for the removal of its sign(s), the patching and painting of penetrations to match building color and the repair of any damages to the building as a result of the sign's presence or removal.

13. Symbols, lettering style, spacing and colors are subject to written approval of Landlord.

**B. INSTALLATION**
Installation and maintenance of all Tenant signs shall be at Tenant's expense and shall be installed in a manner approved by project architect and or Landlord. Tenant shall be fully responsible for the operations of the Tenant's sign contractor.

**C. EXCEPTIONS**
No exceptions shall be permitted without specific written approval of the Landlord.

[00214507;7]                                1

EXHIBIT _A_
PAGE _46_ OF _52_

Exhibit 1 - Page 58

[Signage Criteria Example Diagram on Following Page]

{00214507;7}                                2

EXHIBIT____A_____

PAGE__47__OF__52__

Exhibit 1 - Page 59



EXHIBIT _A_

PAGE _48_ OF _52_

Exhibit 1 - Page 60

EXHIBIT "E"

<u>CONFIRMATION OF LEASE TERM</u>

THIS CONFIRMATION OF LEASE TERM is made this _____ day of _____, _____, between ATLAS _____ LLC, an Oregon limited liability company ("Landlord") and _____ ("Tenant").

By Lease dated the _____ day of _____, _____, between the parties hereto (the "Lease"), Landlord demised and leased to Tenant and Tenant leased and took from Landlord for the Term and upon the terms and conditions set forth therein the Premises being Space Number _____ containing _____ square feet situated in _____ located in _____ County, Oregon, such Premises being more particularly designated in the Lease; and

The parties hereto wish to confirm and memorialize the commencement and expiration dates of the _____ (____) year term.

NOW, THEREFORE, the parties hereto mutually agree as follows

1.      All terms and words of art used herein, as indicated by the initial capitalization thereof, shall have the same respective meanings designated for such terms and words of art in the Lease.

2.      The term of the Lease commenced upon the Rent Commencement Date which for all purposes under the Lease shall be deemed to be _____, _____.  The _____ (____) year term shall expire at midnight on _____, _____, unless sooner terminated or extended as provided in the Lease.

3.      Section 1.1.14 is revised to read as follows

MINIMUM RENT

| Lease Year | Monthly Minimum Rent | Annual Minimum Rent | Rate Per Agreed Sq. Foot | Percentage Rent Breakpoint |
|---|---|---|---|---|
| Years 0-0 | $ | $ | $ | $ |
| Years 0-0 | $ | $ | $ | $ |
| Years 0-0 | $ | $ | $ | $ |

IN WITNESS WHEREOF, the parties hereto have caused this Confirmation of Lease Term as of the day and year first above written.

LANDLORD:                        ATLAS GREENWAY LLC, an Oregon limited liability company

                                 By:     _____
                                         Katherine Durant, President

TENANT:                          _____

                                 By      _____

                                 Title   _____

{00214507;7}                                1                          EXHIBIT _____ A

                                                                       PAGE 49 OF 52

Exhibit 1 - Page 61

EXHIBIT "F"

RULES AND REGULATIONS

Tenant covenants and agrees to comply with the following rules and regulations as they may be modified or amended during the Term

1.       Unless otherwise permitted in the Lease, no sign, advertisement, display, notice, or other lettering shall be exhibited, inscribed, painted, or affixed on any part of the outside of the Premises or inside, if visible from the outside, or outside the building of which they form a part, and in no event shall Tenant place any signs, displays or other advertising material on the glass of the store front of the Premises. All signs, displays, advertisements, and notices of Tenant shall be professional and maintained by Tenant in good and attractive condition at Tenant's expense and risk. Tenant shall not use handbills for advertising at the Retail Center. Any permanent signs must be approved by Landlord.

2.       Tenant shall use the Retail Center's name and logo, if any be designated by Landlord, as either may be changed from time to time, in referring to the location of the Premises in all newspaper, radio, and television or other advertising. Such logo shall be and remain in the sole property of Landlord and Landlord may revoke the license hereby granted to Tenant for the use of same at any time.

3.       No awning or other projections shall be attached to the outside walls of the Premises or the building of which they form a part without, in each instance, the prior written consent of Landlord.

4.       All loading and unloading of goods shall be done only at such times, in the areas and through the service corridor entrances designated for such purpose by Landlord.

5.       All recyclables, garbage and refuse shall be kept in the kind of container specified by Landlord, and shall be placed in the area specified by Landlord and prepared for collection in the manner and at the times and places specified by Landlord. If Landlord shall provide or designate a service for picking up refuse and garbage, Tenant shall use same at Tenant's cost, provided such cost shall be competitive to any similar service available to Tenant. Tenant will not install or cause to be installed any automatic garbage disposal equipment without the prior written consent of Landlord.

6.       No radio or television or other similar device shall be installed without, in each instance, Landlord's prior written consent. No aerial shall be erected on the roof or exterior walls of the Premises, or on the grounds without, in each instance, the prior written consent of the Landlord. Any aerial so installed without such written consent shall be subject to removal without notice at any time.

7.       No loud speakers, television sets, phonographs, radios, or other devices shall be used in a manner so as to be heard or seen outside of the Premises without the prior written consent of Landlord.

8.       No sales advertised as auction, fire, bankruptcy, going out of business or selling-out sales shall be conducted on or about the Premises.

9.       Tenant shall keep Tenant's display windows illuminated and the signs and exterior lights lighted each day and every day of the Term hereof during the hours designated by Landlord.

10.      Tenant shall keep the Premises at a temperature sufficiently high to prevent freezing of water in pipes and fixtures.

11.      Except as otherwise approved by Landlord in writing, Tenant shall not place or maintain any merchandise, security devices, signs or other articles outside of Tenant's store front or in the Common Area Retail Facilities of the Retail Center.

12.      Tenant shall not make or permit any noise or odor which Landlord deems objectionable to emanate from the Premises.

{00214507;7}          1

EXHIBIT ___A___

PAGE _50_ OF _52_

Exhibit 1 - Page 62

13.    Tenant shall not suffer, allow, or permit any vibration, light, or other effect to emanate from the Premises, or from any machine or other installation therein, or otherwise suffer, allow, or permit the same to constitute a nuisance or otherwise interfere with the safety, comfort, or convenience of Landlord or any of the other occupants of the Retail Center or their customers, agents, or invitees or any others lawfully in or upon the Retail Center. Upon notice by Landlord to Tenant that any of the aforesaid is occurring, Tenant agrees to forthwith remove or control the same.

14.    Tenant shall restrict parking by Tenant, its officers, employees, and agents to employee parking areas designated by Landlord. If Tenant or its employees shall fail to park their cars in the designated parking areas after giving notice to Tenant, Landlord shall have the right to charge Tenant Ten and No/100 Dollars ($10.00) per day per car parked in any parking area other than those designated. Tenant shall take such action as is necessary in order to enforce such agreements on behalf of both Landlord and Tenant.

15.    Tenant shall at Tenant's cost use such pest extermination contractor as Landlord may direct and at such intervals as Landlord may require, provided the cost thereof is competitive to any similar service available to Tenant.

16.    Tenant at its expense shall participate in any reasonable window cleaning program that may be established by Landlord for all or substantially all other stores in the Retail Center and shall not permit window cleaning or other exterior maintenance or janitorial services in and for the Premises to be performed except during reasonable hours designated for such purposes by Landlord.

17.    Tenant shall not operate any coin or token vending machine or video games, pinball machine or other entertainment devices or any coin operated device for the sale of any goods, wares, merchandise, food, beverages, or services.

18.    The sidewalks, entrances, passages, and corridors shall not be obstructed or used for any purpose other than ingress or egress. Tenant shall not enter the mechanical rooms, air handler rooms, electrical closets, janitorial closets, or go upon the roof of any buildings in the Retail Center without Landlord's prior written consent.

19.    The toilets, wash basins and other plumbing fixtures shall not be used for any purpose other than those for which they were constructed, and no sweepings, rubbish, rags or other substances shall be thrown therein.

20.    Without Landlord's prior written consent, no Tenant shall mark, paint, drill into, or in any way deface any part of the Premises or any buildings in the Retail Center. No boring, cutting or stringing of wires or laying of linoleum or other similar floor coverings shall be permitted without the prior written consent of Landlord and then only as Landlord may direct.

21.    No additional locks or bolts of any kind shall be placed upon any of the doors or windows by any Tenant, nor shall any Tenant make any changes in existing locks or in the mechanisms thereof. Each Tenant must, upon the termination of its tenancy, give Landlord the combination to all combination locks on safes, safe cabinets and vaults and restore to Landlord all keys of stores, offices, and toilet rooms, either furnished to, or otherwise procured by such Tenant, and in the event of the loss of any key so furnished, such Tenant shall pay to Landlord the cost of replacing the same or of changing the lock or locks opened by such lost key if Landlord shall deem it necessary to make such change.

22.    Canvassing, soliciting and peddling in the Common Areas Retail Facilities are prohibited without Landlord's prior written consent.

23.    No Tenant shall stock, store or warehouse merchandise on the Premises which such Tenant does not intend to offer for sale from the Premises.

{00214507;7}        2

EXHIBIT __A__

PAGE _51_ OF _52_

Exhibit 1 - Page 63

EXHIBIT "G"

LANDLORD SUBORDINATION AGREEMENT

[See Attached]

{00214507;7}

1

EXHIBIT ___A___

PAGE __52__ OF __52__

Exhibit 1 - Page 64



May 24, 2018

**<u>Via First Class Mail and Certified Mail</u>**

Pharmaca Integrative Pharmacy, Inc.
c/o C T Corporation System, Reg. Agent
780 Commercial Street SE Ste 100
Salem, OR 97301

Pharmaca Integrative Pharmacy, Inc.
12180 Scholls Ferry Rd.
Tigard, OR 97223

Pharmaca Integrative Pharmacy, Inc.
c/o Michael L. Kruteck, CFO
4940 Pearl East Circle, Ste 301
Boulder, CO 80301

      Re:   **Pharmaca Integrative Pharmacy, Inc.**
            **Notice of Default**

Ladies and Gentlemen:

      Pursuant to Section 6.4 of the Lease Agreement between Atlas Greenway, LLC and your company for the premises known as 12180 Scholls Ferry Road, Tigard, Oregon 97223, (the "Lease"), your company must adhere to use standards outlined in the Lease as well as all of the Center's operating rules and regulations. Your company is currently in violation of the use standards and the Center's operating rules and regulations, and as such this letter is notice of default and opportunity to cure.

      Specifically, your company has advertise a "Store Closing Clearance" sale (see photograph enclosed) in violation of §8 of Exhibit F of the Lease.

      Separately, §6.1 of the Lease requires your company to maintain a fully stocked store.

      This letter is notice of default under the Lease (§17.1). If the defaults are not cured within the time permitted by the Lease, the Landlord may terminate the Lease pursuant to §17.2, or exercise any other remedies allowed by the Lease.

      Thank you for your anticipated cooperation.

                  Respectfully,

                  CAMILLE BONE
                  *Property Manager*

EXHIBIT___B___
PAGE___1___OF___2___

Exhibit 1 - Page 65



Exhibit 1 - Page 66

Abraham J. Barnett
Attorney at Law

**The Barnett Firm, LLC**
*11501 SW Pacific Hwy, Suite 201*
*Portland, OR 97223*
*(503) 688-5106*

ajbarnett@hg-wt.com

RECEIVED

MAR 0 9 2020

LANE POWELL PC

March 4, 2020

**Via First Class Mail and Email**

Charles F. Hudson
Bruce H. Cahn
Lane Powell PC
601 SW Second Ave, Suite 2100
Portland, OR 97204-3158
hudsonc@lanepowell.com
cahnb@lanepowell.com

Re:    **Atlas Greenway, LLC vs. Pharmaca Integrative Pharmacy, Inc.**

Mr. Hudson and Mr. Cahn:

Enclosed with this letter is a courtesy copy of the Complaint filed against Pharmaca in Washington County Circuit Court.

Your position assumes that your client properly exercised its right to "go dark" under the Lease. I disagree, as the "go dark" provision had certain notice requirements which were, inarguably, not met. However, assuming *arguendo* that your position was correct and that your client had properly exercised the "go dark" provision, the amount you should have offered was $281,271.71.[1]  Had you offered at least that amount, along with an explanation of why you believe your position to be correct, my client would have taken your offer seriously. However, the arguments and explanations in your letters of February 10 and February 20 are, in my estimation and the estimation of my client, nonsense. For that reason, my client has elected to file suit rather than make a counteroffer. If your client decides to make an offer based on a logical argument, please let me know.

I trust that since we are providing this courtesy copy, there will be no need for an extension of time for your client to file an answer.

Very Truly Yours,

ABRAHAM J. BARNETT

AJB/cdc
Enclosure

---

[1] Had Pharmaca exercised the "go dark" provision properly, Atlas would not have exercised its option to terminate the Lease until they had procured a new tenant. Atlas' efforts to locate a replacement tenant would not have been affected (i.e., the replacement tenant would not have been located any more quickly). As such, Pharmaca would have remained obligated to pay full rent until Atlas terminated the Lease.

Exhibit 1 - Page 67

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF WASHINGTON

| | |
|---|---|
| ATLAS GREENWAY, LLC, an Oregon limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>PHARMACA INTEGRATIVE PHARMACY, INC., a foreign corporation,<br><br>Defendant. | Case No. 20CV09996<br><br>**SUMMONS** |

TO:  **Pharmaca Integrative Pharmacy, Inc., C/O R.A.: C T Corporation System 780 Commercial Street, Ste. 100, Salem, OR  97301.**

You are hereby required to appear and defend the complaint filed against you in the above entitled action within thirty (30) days from the date of service of this summons upon you, and in case of your failure to do so, for want thereof, plaintiff(s) will apply to the court for the relief demanded in the complaint.

NOTICE TO DEFENDANT: READ THESE PAPERS CAREFULLY!

You must "appear" in this case or the other side will win automatically.  To "appear" you must file with the court a legal paper called a "motion" or "answer".  The "motion" or "answer" must be given to the court clerk or administrator within 30 days along with the required filing fee.  It must be in proper form and have proof of service on the plaintiff's attorney or, if the plaintiff does not have an attorney, proof of service upon the plaintiff.  If you have any questions, you should see an attorney immediately.  If you need help in finding an attorney, you may call the Oregon State Bar's Lawyer Referral Service at (503) 684-3763 or toll-free in Oregon at (800) 452-7636.

Abraham J. Barnett, OSB # 082545
Christene D. Cencer, OSB #163589
The Barnett Firm, LLC
11501 SW Pacific Hwy., Suite 201
Portland, OR  97223
(503) 688-5106
ccencer@hg-wt.com

STATE OF OREGON        )
                                        ) ss.
County of Washington    )

I, the undersigned attorney of record for the plaintiff, certify that the foregoing is an exact and complete copy of the original summons in the above entitled action.

Abraham J. Barnett
ATTORNEY OF RECORD FOR PLAINTIFF

TO THE OFFICER OR OTHER PERSON SERVING THIS SUMMONS:  You are hereby directed to serve a true copy of this summons, together with a true copy of the Complaint mentioned therein, upon the individual(s) or other legal entity(ies) to whom or which this summons is directed, and to make your proof of service on the reverse hereof or upon a separate similar document which you shall attach hereto.

Abraham J. Barnett
ATTORNEY OF RECORD FOR PLAINTIFF

PAGE 1 – SUMMONS

The Barnett Firm, LLC
11501 SW Pacific Hwy.
Suite 201; Portland, OR 97223
(503) 688-5106 (503) 716-4633 fax

Exhibit 1 - Page 68

 CT Corporation

**Service of Process Transmittal**
03/06/2020
CT Log Number 537339058

TO:     Laura Price
        Pharmaca Integrative Pharmacy, Inc.
        4940 Pearl East Cir Ste 301
        Boulder, CO 80301-2442

RE:     **Process Served in Oregon**

FOR:    Pharmaca Integrative Pharmacy, Inc.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | ATLAS GREENWAY, LLC, ETC., PLTF vs. PHARMACA INTEGRATIVE AND PHARMACY, INC., ETC., DFT. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint, Attachment(S) |
| **COURT/AGENCY:** | Washington County Circuit Court, OR<br>Case # 20CV09996 |
| **NATURE OF ACTION:** | Breach of Contract |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Salem, OR |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 03/06/2020 at 15:50 |
| **JURISDICTION SERVED :** | Oregon |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days (Document(s) may contain additional answer dates) |
| **ATTORNEY(S) / SENDER(S):** | ABRAHAM J. BARNETT<br>THE BARNETT FIRM, LLC<br>11501 SW Pacific Hwy., Suite 201<br>Portland, OR 97223<br>503-688-5106 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 03/06/2020, Expected Purge Date: 06/04/2020<br><br>Image SOP<br><br>Email Notification,  Laura Price  lprice@pharmaca.com |
| **SIGNED:**<br>**ADDRESS:** | C T Corporation System<br>208 LaSalle Ave<br>Suite 814<br>Chicago, IL 60604 |
| **For Questions:** | 866-539-8692<br>CorporationTeam@wolterskluwer.com |

Page 1 of  1 / PP

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

Exhibit 1 - Page 69

1

2

3

4                IN THE CIRCUIT COURT OF THE STATE OF OREGON

5                     FOR THE COUNTY OF WASHINGTON

6   ATLAS GREENWAY, LLC, an Oregon limited  )
    liability company,                       )
7                                            )   Case No. 20CV09996
                            Plaintiff,       )
8                                            )   DEFENDANT'S NOTICE TO CLERK OF
        vs.                                  )   THE COURT AND ADVERSE PARTY OF
9                                            )   FILING OF REMOVAL TO FEDERAL
    PHARMACA INTEGRATIVE PHARMACY,           )   COURT
10  INC., a foreign corporation,             )
                                             )
11                         Defendant.        )
                                             )
12  _____     )

13  TO:   The Clerk of the Circuit Court of the State of Oregon for the County of Washington, and
          to Plaintiff and its Attorneys of Record, Abraham J. Barnett and Christene D. Cencer

14

15        PLEASE TAKE NOTICE THAT on March 31, 2020, defendant Pharmaca Integrative

16  Pharmacy, Inc. filed a Notice of Removal ("Notice") in the United States District Court for the

17  District of Oregon.  A true and correct copy of the Notice is attached as **Exhibit 1**.

18        PLEASE TAKE FURTHER NOTICE that, by the filing of such Notice and by the filing

19  herein of this notice to state court of removal to federal court, the above-entitled action has been

20  removed from this Court to the United States District Court for the District of Oregon

21

22

23

24

25

26

PAGE 1 -   DEFENDANT'S NOTICE TO CLERK OF THE COURT AND ADVERSE PARTY
           OF FILING OF REMOVAL TO FEDERAL COURT

718696.0001/8013968.2

1  pursuant to 28 U.S.C. §§ 1331, 1441(a), and 1446, and this Court may proceed no further unless

2  and until the case is remanded.

3      DATED:  March 31, 2020

4                                    LANE POWELL PC

5

6                                    By s/ Bruce H. Cahn
                                        Bruce H. Cahn, OSB No. 935450
7                                       Mohammed N. Workicho, OSB No. 186140
                                        Telephone: 503.778.2100
8                                       Facsimile: 503.778.2200
                                        docketing-pdx@lanepowell.com
9                                    Attorneys for Defendant

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PAGE 2 -   DEFENDANT'S NOTICE TO CLERK OF THE COURT AND ADVERSE PARTY
           OF FILING OF REMOVAL TO FEDERAL COURT

1    **CERTIFICATE OF SERVICE**

2        I hereby certify that on March 31, 2020, I caused to be served a copy of the foregoing

3    NOTICE OF REMOVAL TO FEDERAL COURT on the following person(s) in the manner

4    indicated below at the following address(es):

5    Abraham J. Barnett
     Christene D. Cencer
6    11501 SW Pacific Hwy., Suite 201
     Portland, OR 97223
7    E-mail: ajbarnett@hg-wt.com; ccencer@hg-wt.com

8    ☐   **by CM/ECF**
     ☑   **by Electronic Mail (courtesy copy)**
9    ☐   **by Electronic Mail (e-mail agreement in place)**
     ☐   **by Facsimile Transmission**
10   ☑   **by First Class Mail**
     ☐   **by Hand Delivery**
11   ☐   **by Overnight Delivery**

12                                    s/ Bruce H. Cahn
                                      Bruce H. Cahn
13

14

15

16

17

18

19

20

21

22

23

24

25

26

PAGE 3 -   CERTIFICATE OF SERVICE